JORDAN MARSH COMPANY *vs.* NATIONAL SHAWMUT BANK.

SAME *vs.* NATIONAL EXCHANGE BANK.

SAME *vs.* SECOND NATIONAL BANK.

SAME *vs.* NATIONAL SUFFOLK BANK.

SAME *vs.* INTERNATIONAL TRUST COMPANY.

SAME *vs.* OLD COLONY TRUST COMPANY.

SAME *vs.* CITY TRUST COMPANY.

Suffolk.   January 18, 1909. — March 5, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Banks.   Clearing House.   Bills and Notes,* Rights of payor of check fraudulently procured from maker, Fictitious payee, Negligence of maker.   *Negligence.   Proximate Cause.*

It is the duty of a bank, in making payment of a check of a depositor to an indorsee of the payee from funds of the depositor in its possession, to see that the signature of the payee of the check is genuine, and this duty is not affected by the bank's adopting the conveniences of a clearing house system and making payments on the guaranty by another bank of the indorsement of the payee's name.

A depositor cannot recover from a bank money paid by the bank to the payee named in a check of the depositor, although the check was made without consideration and was procured from the depositor by the fraud of a third person, if the bank did not know of the fraud.

An employee of a corporation conducting a large department store of eighty departments, by making use of a faulty system in vogue in the store and of the carelessness of the other employees and by numerous forgeries and misrepre-

sentations on his part, procured from the proper officer of the corporation checks upon a bank where the funds of the corporation were deposited, some of the checks being payable to a person who was in existence but who was not one to whom the corporation owed anything or one who knew anything of the transaction, and others being payable to persons wholly fictitious. There were one hundred and seventy of such operations, extending over a period of about five years and involving about $50,000. The employee forged the names of the payees upon the checks and they were presented through a clearing house to the bank upon which they were drawn with the indorsement of the payee guaranteed by another bank, and were paid by it from funds of the corporation there deposited. The initial perpetration and the continuance of the fraud and crime were made possible by violations of rules of the store by, and by negligence of, the store employees. The corporation conducting the store brought an action of contract against the bank for the amounts paid upon such checks. The bank contended that it was induced to pay the checks through negligence of the plaintiff. *Held*, that the negligence of the plaintiff was not the proximate cause of the checks being paid upon fraudulent indorsements, and that, the defendant having failed in its duty to see that the indorsements upon the checks were genuine, the action might be maintained.

SEVEN ACTIONS OF CONTRACT to recover from the defendants, in whose several banks the plaintiff was a depositor, the amounts of forty-two checks, aggregating $15,684.20, alleged to have been paid by the defendants and charged to the plaintiff's accounts without its authority. Writs in the Superior Court for the county of Suffolk dated June 19, 1905.

The cases were referred to James D. Colt, Esquire, as auditor, to be heard together, and afterward were heard together by *Fessenden*, J., upon the auditor's report. He found *pro forma* for the defendants, in accordance with the rulings of the auditor, and reported the cases for determination by this court.

Besides the facts stated in the opinion, the auditor found as follows : " The store [of the plaintiff] is very large and is known as a department store. There are in all about eighty separate departments. . . . Each department is in charge of an employee known as a buyer, who purchases the goods for and generally supervises his department. Accounts are kept with the various departments in the main office of the company."

It also appeared from the auditor's report that in 1899 one Keefe, who was employed by the partnership, which was the plaintiff's predecessor, as " Claim and Returned Goods Clerk " and had been in their employ for six years, devised, in conjunction with one Gretsinger, the following plan :

" False bills were to be prepared and Keefe was to check them

as though the goods called for by the bills had been received. He was to forge the various signatures other than his own, and get a check in payment by representing that he was a friend of the seller, who was anxious for his money, and would take the check to him. Neither of the conspirators had a bank account, and they foresaw difficulty when it came to getting the checks paid. Gretsinger said that he had a sister, Annie L. Sefton, and that if the bills and checks were made out to A. L. Sefton, he could devise some story and persuade her to have the checks cashed for him. The proceeds were to be divided between Keefe and Gretsinger. Mrs. Sefton knew nothing of the fraud until its discovery years later.

" The plan was put into operation in November, 1899, and was successful. The first bills and checks were in the name of A. L. Sefton, and the checks were indorsed and presented by her and paid. Very soon Keefe decided that there was no need of Mrs. Sefton's signature, for he could forge it and get the checks cashed in another way. He succeeded in some way not made entirely clear to me, in persuading one John Morrissey, a man who had a bank account and as to whom no claim was made that he was cognizant of the fraud being practised, to indorse all subsequent checks. Gretsinger was then dropped and not allowed to further participate in the proceeds of the fraud.

" Keefe then had bill heads printed in the name of L. B. Hayes and C. E. Smith. L. B. Hayes and C. E. Smith were fictitious persons, having no existence. Keefe's manner of proceeding was as follows : He would first make out a bill showing a quantity of goods bought, and take it to one of the registry clerks to be registered. He would tell the clerk that he wanted the bill registered at once, because the buyer was in a hurry for the goods, or that the seller was a friend who needed the money as soon as possible. The clerk then registered the bill, stamped it, and handed it back to Keefe, who took it away. Keefe then forged the signature of the buyer for the department indicated and checked the bill, usually signing it himself, but occasionally forging the name of one of the other examiners. He then took the bill to the stock department, telling the same or a similar story to one of the clerks there, who figured the bill and

handed it back to Keefe. The next step was to forge the signature or initial of a member of the firm or director. This done Keefe took the bill to the registry clerk to have it stricken from the registry. This done, the bill was again given to him and he returned to the stock department with it, where it was entered in the invoice or stock books and charged to the department presided over by the buyer whose forged signature appeared on the bill. The bill was then handed back to Keefe, who took it to the bookkeeper, a Mr. Fogg, and telling him the same or a similar story, got the discounts figured. Keefe's duties as claim and returned goods clerk frequently called him to the stock, the bookkeeping, and the registry departments. Fogg then directed a check to be drawn. The check was drawn, signed, and a pay slip made out. The address of the payee was then written on the pay slip, and the check and pay slip handed to Keefe by Fogg. Keefe took the check and pay slip away, and later returned the pay slip to Fogg, having in the meantime written the name of the payee thereon to show that the check had been received. He also then wrote the name of the payee on the back of the check, got Morrisey to indorse it, and obtained payment, with few exceptions, from the Commercial National Bank, in which Morrisey kept his account. The check was stamped on its back with a rubber stamp by the Commercial National Bank, with the words, — 'Endorsement guaranteed, Pay only through the Boston Clearing House. The Commercial National Bank of Boston, B. B. Perkins, Cashier.' The stamp also contained the date and the bank's clearing house number. These checks were sent to the clearing house by the Commercial National Bank and were received from the clearing house by the defendant banks and paid by them from moneys in their possession belonging to the plaintiff. . . .

" Shortly after ten o'clock in the morning of each banking day the defendant banks and trust companies would each receive a package of checks from the clearing house. The checks were examined by the proper officials of the bank, who looked to see that the maker's signature on each check was genuine, that the check was properly drawn, and that the payee's name appeared on the back. No effort was made to ascertain whether or not the payee's signature was genuine. In the present case each

bank relied on the stamped guaranty of the Commercial or other national bank. The clearing house rules provide that any check found not good for any reason must be returned to the bank from which it was received not later than twelve o'clock noon on Saturdays and not later than one o'clock P. M. on other days. The treasurer of the plaintiff was familiar with the general way in which checks are paid through the clearing house. The defendant banks each received from the clearing house every morning a large number of checks, varying from one thousand to five thousand, and it was necessary for each check to be examined and either paid, or returned for some irregularity, before the hour set in the clearing house rule. For a paying bank to ascertain whether or not the indorsements on all checks drawn by its depositors were genuine, would be almost if not quite impossible, if the present requirements of business are to be met with, even though the clearing house rules were changed so as to give more time. The Jordan Marsh Company, for example, sent out six thousand to seven thousand checks a month, all drawn on the defendant banks. The banks could not know beforehand to whom these checks were to be made payable, and therefore could not in the nature of things be prepared to pass upon the signature of the payees. If obliged to do so, the banks would have to refuse payment of all checks, unless presented for payment over the counter by the payee in person, properly identified. This would seriously cripple and practically render it impossible to carry on business, as business is now conducted.

"As to the checks in question coming through the clearing house, there was not, for the reasons above stated, any verification of the genuineness of the payee's signature, other than as herein appears, but all of them were examined in the customary manner to see that the Jordan Marsh Company signature was genuine, that there was nothing irregular or suspicious about their face, that they were indorsed with the payee's name, and that they bore the indorsement of the bank sending them through the clearing house. None of the checks showed any irregularity, and they were all presented for payment within a few days of date. Each one of the defendant banks either once or twice a month sent a statement with all paid checks, includ-

ing the checks in question, to the plaintiff, and, until Keefe was arrested, received no notice that the checks had been obtained by fraud.

" There were two classes of fraudulent checks paid by the banks, i. e., those which were paid through the clearing house and those which were paid over the counter. This latter class consisted of checks payable to A. L. Sefton, and they were paid directly to A. L. Sefton. . . . The same is true of a few checks which were paid through the clearing house, which bore the genuine indorsement of A. L. Sefton."

From the report it further appeared that the fraudulent operations of Keefe covered a period extending from November, 1899, to early in the year 1905, that during that period the number of the fraudulent checks issued was upwards of one hundred and seventy, each transaction requiring at least four forgeries, and that, by reason of Keefe's operations, the plaintiff was defrauded of more than $50,000.

It further appeared that the fraud was made possible by various of the employees of the plaintiff acting negligently and directly contrary to the regulations of the plaintiff, and that, if such employees had performed their various duties as they should have, the fraud would have been impossible from the outset. The report continues :

" Notwithstanding the failure of the various employees above mentioned to comply with the method adopted by the plaintiff for the prevention of fraud, which failure resulted in the obtaining of the checks in payment of the fraudulent bills, there were at all times kept by the plaintiff the bills themselves and various books which would, if investigated, have disclosed the fact that the checks were being issued in payment of fraudulent bills. An examination of the 'City Book' kept in the receiving department would have shown that no goods were ever received from Sefton, Smith, or Hayes, but the book was not examined. An examination by the buyer of any selling department of the invoice book, which was kept in the stock department, would have shown him that he was charged with having purchased goods from parties with whom he had never dealt, and the fraud would have been discovered. The fraud, as a matter of fact, was discovered in this way. One of the buyers, after a semi-annual

stock taking, could not understand how his department could show so large a shortage as it did. He inspected the invoice book and at once noticed that goods purporting to have been purchased from Sefton, Hayes, and Smith were charged to his department. He knew he had made no purchases from such persons and asked to see the bills. An inspection of the bills at once disclosed the fraud. A similar inspection would have discovered the fraud at any time during its continuance. There was in fact a shortage in the various departments to which the fraudulent bills were charged, during the entire period covered by the fraud.

"The fraud could have been entirely prevented by sending each day to the buyer of a department a memorandum of the charges made against his department. . . .

"The system which [the plaintiff] had in force . . . was evidently inadequate to prevent fraud, and such as it was, it was not strictly adhered to.

"The banks relied, and I think properly, on the plaintiff's taking every reasonable precaution in the issuing of checks, and certain precautions were not taken.

"I find, therefore, that the plaintiff was negligent; that if it had exercised the care which could fairly be expected of it, the checks would not have been issued and no loss would have occurred, and that owing to its negligence, the banks were misled into paying the checks. . . . I find that the plaintiff is not entitled to recover from any one of the defendants."

*C. K. Cobb*, (*W. D. Whitmore, Jr.*, with him,) for the plaintiff.

*B. N. Johnson & W. O. Underwood*, (*W. T. A. Fitzgerald* with them,) for the defendants.

KNOWLTON, C. J. These are seven actions, brought against seven corporations doing a banking business in the city of Boston. In each of these banks or banking companies the plaintiff was a depositor. The actions are all of the same character, and the opinion in the first of them will be equally applicable to all the others. The declaration contains two counts, one for money had and received, to recover the balance of the plaintiff's deposit after a demand, and the other setting forth the contract between the plaintiff and the defendant, and that the plaintiff made sundry checks, payable in part to the order of

fictitious or non-existing persons, which fact as to these persons was not known to the plaintiff, and in part to the order of one A. L. Sefton, and that the defendant paid these checks upon forged indorsements of the names of the payees. The cases were submitted to the Superior Court upon the report of an auditor who found for the defendants. The judge found *pro forma* for the defendants, and reported the cases to this court.

It appears by the auditor's report that the plaintiff was conducting a very large business in selling goods in a department store. In the store there were about eighty separate departments, each in charge of an employee known as a buyer. There was in the store an elaborate system for buying, receiving, checking off, registering and inventorying all goods brought to the store for sale, and for dealing with the bills for these goods and authorizing payment for them, and for making and transmitting checks to vendors. There were certain variations from the usual method of dealing with bills and checks when a buyer was in a hurry to get the goods upon the shelves for sale, or when a large discount could be obtained from a bill by immediate payment of it, or when a bill was presented by a seller in person who was eager to be paid at once. One of the plaintiff's employees, who was hired as a checker of the goods received, devised a scheme of fraud, whereby, with the assistance of a confederate for a time, he was able to obtain the plaintiff's checks in payment of fictitious bills for goods supposed to have been bought by heads of departments and received at the store. Many of these checks were drawn on the defendant bank, and were paid by the defendant through the clearing house. The defendant did not verify nor attempt to verify the signatures of the payees on the checks, but the checks were examined to see that the signature of the plaintiff was genuine, that there was nothing irregular or suspicious on their face, that they were indorsed with the payee's name, and that they bore the indorsement of the bank sending them through the clearing house. On the checks, or on most of them, were stamped the words, " Endorsement guaranteed. Pay only through the Boston Clearing House. The Commercial National Bank of Boston, B. B. Perkins, Cashier." The payments were made by the defendant from moneys belonging to the plaintiff. The auditor found " that there was no actual negli-

gence on the part of either of the defendant banks or trust companies in paying the checks."   "If negligence of any kind can be imputed to them," he says, "it was constructive negligence, and not the result of their doing or failing to do anything which could reasonably be expected of them."   This finding, in connection with the facts stated in the report on which it is founded, is erroneous in law.   The implied contract between the banker and his depositor in regard to the depositor's checks is that the banker will pay them from his deposit to the persons to whom he orders payment to be made.   When a definite order is made in the check, the duty of the banker is absolute, as a general rule, to pay only in accordance with the order.   If payment is to be made to the order of a person named in the check, and if he orders the payment to be made to another person, it is the duty of the banker to see that the signature of the payee is genuine.   *Murphy* v. *Metropolitan National Bank*, 191 Mass. 159, 164.   *Greenfield Savings Bank* v. *Stowell*, 123 Mass. 196. *Dedham National Bank* v. *Everett National Bank*, 177 Mass. 392, 395.   *Critten* v. *Chemical National Bank*, 171 N. Y. 219, 228. *Hardy* v. *Chesapeake Bank*, 51 Md. 562.   *Harter* v. *Mechanics National Bank*, 34 Vroom, 578, 580.   This rule of law applies as well to payments made by a banker through the clearing house as to payments made over the counter.   The duty is the same and the performance of it is as important in one case as in the other.   If the methods of the clearing house are a convenience to bankers in the transaction of their business, and the bank on which a check is drawn chooses to pay on a guaranty of the indorsement of the payee's name by another responsible bank, this does not affect the duty of the paying bank to its depositor. It simply indicates a willingness of the bank to disregard and neglect the duty, upon the guaranty of a responsible party that the duty has already been perfectly performed for it by a preceding party from whom the check has been received.

The term "constructive negligence" is not properly applicable to the failure of a banker to look to the interest of his depositor in such a case.   In *National Bank of North America* v. *Bangs*, 106 Mass. 441, when the payees of a check had indorsed it in blank by writing on the back their names, "E. D. and G. W. Bangs Company," and deposited it in their bank, whence it

was transmitted to the plaintiff bank on which it was drawn and was there paid, the failure of the bank to detect the forgery of the drawer's name was called, as between the parties, a constructive fault.  In that case the payees indorsed the check in the usual way of indorsing commercial paper to transfer the title to it, and if the check had been transferred to a purchaser instead of deposited for collection, they would have been bound as guarantors of the genuineness of the drawer's signature.  When, subsequently, it turned out that the signature of the drawer was forged, it was said in the opinion of this court: "The check had not gone into circulation, and could not get into circulation until it was indorsed by the defendants.  Their indorsement would certify to the public, that is to every one who should take it, the genuineness of the drawer's signature.  Without it, the check could not properly be paid by the plaintiff.  Their indorsement tended to divert the plaintiff from inquiry and scrutiny, as it gave to the check the appearance of a genuine transaction, to the inception of which the defendants were parties.  Their names upon the check were apparently inconsistent with any suspicion of a forgery of the drawer's name."  "If the suit were between the bank, or drawee, and a party who took the check in the usual course of business, finding it in circulation, or even by first indorsement by a payee, the loss would fall upon the bank."  Under similar circumstances and as between similar parties, a distinction between actual fault or negligence and constructive fault was restated in *First National Bank of Danvers* v. *First National Bank of Salem*, 151 Mass. 280.  But the difference between such a case and that of an action between a bank and its depositor, founded on a payment of the depositor's check upon a forged indorsement of the name of the payee, without inquiry by the bank as to the genuineness of the indorsement, is obvious.  The facts reported by the auditor show an entire neglect of legal duty on the part of the defendant.  If there was or could be any attempt to perform this duty on its behalf by any previous holder of a check, under such circumstances that the defendant, upon the facts of this case, can take advantage of the effort, there is nothing in the report to show it.  We have a naked case of payment of the plaintiff's checks in reliance upon a responsible guarantor of the indorsement, and without doing anything to

perform the duty which the defendant owed the plaintiff in reference to his order for the payment. If the case stopped here the defendant's liability for the payment would be unquestionable.

The auditor has found that the plaintiff, in the method of doing its business and in the conduct of its officers and employees, was negligent in not discovering and preventing the fraud by which it was induced to draw checks payable to fictitious persons, and to another person who was not entitled to payments. The auditor has also found that this negligence induced the defendant to pay these checks. The facts are pretty fully stated in the report, and the question arises whether there was any evidence of negligence which was a direct and proximate cause of the payment of these checks upon forged indorsements, or whether the negligence only produced conditions which were followed by criminal acts of forgery by a third person, which acts were not discovered by the defendant through its failure to make investigation as to the pretended indorsements by the payees. Assuming that, under some circumstances, negligence of a depositor inducing an unauthorized payment of a check by a banker may be availed of in defense of a claim by the depositor for the money paid, it seems plain that only negligence which is a direct and proximate cause of the payment can be effectual in making such a defense. Some of these checks were made payable to A. L. Sefton, a woman, and were indorsed by her. We think it plain that these were not payable to a fictitious person, and that the payments were rightly made. Other checks were in the same form and were not indorsed by her. Assuming for the moment that these were not payable to a fictitious person, they were paid on forged indorsements. If one is fraudulently induced to deliver to a person who is not entitled to it a check made payable to another person who is not entitled to payment of it, can his negligence in suffering the fraud to be practised upon him be found to be a direct and proximate cause of a payment made by the banker on whom the check is drawn, upon a forged indorsement of the name of the payee, without any investigation by the banker as to the genuineness of the indorsement? We think not. The check is like any other check payable to a real person which happens to be in the possession of another person. It is possible to forge an indorsement upon

it, as it is to forge an indorsement upon any other check. Perhaps the circumstances make a speedy detection of such a forgery less probable than in ordinary cases. But the whole duty of seeing whether there is a forgery of such an indorsement upon any check rests primarily upon the banker. The drawer of the check has nothing to do with that. Ordinarily he makes no representation that has any relation to it. In the case just supposed he made no representation in regard to it. The checks payable to the order of A. L. Sefton, which she did not indorse, were wrongly paid, and the defendant's liability for payment is like that for the payment of any other check bearing such a forged indorsement. The plaintiff had nothing to do with the payment, or with the defendant's performance or non-performance of its duty to see that payment was made to the right person.

There are many cases that illustrate the rule that negligence of the maker is immaterial unless it is of a kind that directly and proximately affects the conduct of the banker in the performance of his duties. *Belknap* v. *National Bank of North America,* 100 Mass. 376. *Shepard & Morse Lumber Co.* v. *Eldredge,* 171 Mass. 516. *Arnold* v. *Cheque Bank,* L. R. 1 C. P. D. 578, 587. *Bank of Ireland* v. *Evans' Charities,* 5 H. L. Cas. 389. *Colonial Bank of Australasia* v. *Marshall,* [1906] A. C. 559. *Scholfield* v. *Earl of Londerborough,* [1896] A. C. 514. *Macbeth* v. *North & South Wales Bank,* [1908] 1 K. B. 13. *Robarts* v. *Tucker,* 16 Q. B. 560. *Shipman* v. *Bank of New York,* 126 N. Y. 318. *National Bank* v. *Nolting,* 94 Va. 263. *Welsh* v. *German American Bank,* 73 N. Y. 424. *Armstrong* v. *National Bank,* 46 Ohio St. 512. *Harter* v. *Mechanics National Bank,* 34 Vroom, 578, 580. *German Savings Bank* v. *National Bank,* 101 Iowa, 530. *Janin* v. *London & San Francisco Bank,* 92 Cal. 14.

The question arises whether the making of a check payable to a fictitious or non-existing person, through negligent failure to discover the fraud by which the check is obtained, stands differently from making a check to an actual person, in reference to its effect upon payment by the defendant. We are of opinion that there is no difference in law. In either case it is the duty of the bank to see that there is a genuine indorsement. In some

respects it would be more difficult to deceive a bank in this particular, as against vigilant investigation, if the payee was fictitious than if he were real. In some respects it might be less difficult. We know of no decision that has recognized a difference in law between the two cases. It has been held that there is no difference. *Armstrong* v. *National Bank*, 46 Ohio St. 512.

The defendant relies upon *Bank of England* v. *Vagliano Brothers*, [1891] A. C. 107. This case was peculiar in its facts. The Queen's Bench Division (*Vagliano Brothers* v. *Bank of England*, 22 Q. B. D. 103) and the Court of Appeals (23 Q. B. D. 243) both decided in favor of the plaintiffs. The law lords, on appeal, were divided in opinion, a majority of them holding that the bills of exchange were payable to a fictitious or non-existing person, and so payable to bearer under the English statute. Two of them thought that the decision should be for the plaintiffs. Four were of opinion that the conduct of the plaintiffs precluded them from recovery.

It is to be noticed, first, that the instruments in question were not bank checks, but were in the form of drafts or bills of exchange purporting to be drawn on the plaintiffs by a firm in Greece in favor of a firm in Constantinople. The plaintiffs accepted them, and sent a special letter of advice to the defendant requesting that they be paid at maturity. Some of the law lords were of opinion that the representations of the plaintiffs and the circumstances attending the transaction relieved the defendant of any duty to verify the signature of the payee. Indeed, it was assumed by them that, under the circumstances, the defendant bank was not expected by the plaintiffs to delay the payment until it could send to Constantinople and ascertain whether the signature of the payee was genuine. The decision of the case was made to rest very largely upon the English negotiable instruments act, which makes a negotiable instrument payable to a fictitious or non-existing person payable to bearer, even though the maker is ignorant of the fact that the payee is fictitious, while, under our statute, as at the common law, an instrument so made is not payable to bearer unless the maker knows that the person named as payee is fictitious or non-existing. R. L. c. 73, § 26. This case does not require us to change the

rule of law applicable to the payment of checks of a depositor by a banker.

We are of opinion that, in the facts stated by the auditor, there was no evidence of negligence that relieved the defendant of its duty to pay only to a person authorized to receive the money, under the language of the check.

The case of *Shipman* v. *Bank of New York*, 126 N. Y. 318, is almost identical in its leading features with the case before us, and the decision of it fully covers the conclusion which we have reached.

There is a dispute between the parties as to whether the checks payable to A. L. Sefton, on which her signature was forged, were payable to a fictitious or non-existing person, within the meaning of the statute. Perhaps this question is not very important; for in either view the payments were obtained on forged indorsements, and it is immaterial to the rights of the parties whether the forgeries were of the name of a real person or of a fictitious person. *Armstrong* v. *National Bank*, 46 Ohio St. 512. The checks were all made upon a representation to the person drawing them that there was a person, whose name was given, to whom the plaintiff owed the sum stated. The drawer of the check intended that it should be payable only to the person named in it. If the person named was a real person whose name was given to designate her, then the fraud was not in reference to the existence of the person, or as to her being intended by the name written in the check, but as to the statement that a payment was due her. The check would, therefore, be according to the truth in reference to the person intended, and would be a fraud upon the maker only in reference to the alleged indebtedness. If there was no such person as the one named, the check would be false through a fraud upon the maker in both particulars, and the check would not be payable to the person named, because there was no such person. The result would be the same if a name was chosen which was not intended to represent any person, even though it was known that there was a person to whom the name belonged. The name so used would be none the less fictitious that it was a real name of a person not intended to be designated.

The auditor found that the name A. L. Sefton upon checks

which she had not indorsed was that of a fictitious person.   The report does not state the facts and evidence sufficiently to show whether this finding was right or not.   It depends upon whether the name given by the person who suggested it, and whose suggestion was followed by the drawer of the check, was used as designating the person to whom the name belonged, or as a mere name, without reference to its belonging to any person, and with an intention that it should not designate any particular person.   *Rowe* v. *Putnam*, 131 Mass. 281.

It is fairly to be presumed, from the general statement of the business done between the parties, that the defendant periodically returned checks to the plaintiff with an account stated. It was the duty of the plaintiff, if such accounts were rendered, to examine them reasonably, to see whether they were correct. This duty, as between banker and depositor, is generally recognized.   *Dana* v. *National Bank of the Republic*, 132 Mass. 156. *Leather Manufacturers' Bank* v. *Morgan*, 117 U. S. 96.   It has been held, in cases where the depositor failed to make such an examination within a reasonable time, that he was estopped from claiming moneys erroneously paid out which were stated in the account, at least so far as his omission to examine caused damage to the banker through his consequent failure to avail himself of means of reimbursement.   *Critten* v. *Chemical National Bank*, 171 N. Y. 219.   *Janin* v. *London & San Francisco Bank*, 92 Cal. 14. This defense is not set up in the answer in this case, nor referred to in the report.   It is very generally, if not universally, held that this duty of the depositor does not extend to an examination of the signatures of the payees of the checks, for he is not expected to know them, and the banker is expected to see that the payments are properly made.   *Murphy* v. *Metropolitan National Bank*, 191 Mass. 159, and cases cited.   *Shipman* v. *Bank of New York*, 126 N. Y. 318.   *Welsh* v. *German American Bank*, 73 N. Y. 424.   *Harter* v. *Mechanics National Bank*, 34 Vroom, 578.   *German Savings Bank* v. *Citizens National Bank*, 101 Iowa, 530.   *United Security Ins. & Trust Co.* v. *Central National Bank*, 185 Penn. St. 586.

*New trial ordered.*