# United States Cold Storage Company, Appellant, v. Central Manufacturing District Bank, Appellee.

## Gen. No. 32,944.

Heard in the third division of this court for the first district at the October term, 1928. Opinion filed January 30, 1929. Rehearing denied February 14, 1929.

EUGENE P. KEALY, for appellant.

Litsinger, Healy & Reid, and Winston, Strawn & Shaw, for appellee.

Mr. Presiding Justice Holdom delivered the opinion of the court.

In this case the circuit court, at the close of the case of the plaintiff, on the motion of defendant, instructed a verdict in defendant's favor, upon which a judgment of *nil capiat* and for costs was entered, to which action of the court plaintiff preserved the customary exceptions and made the usual motions, which entitle plaintiff to our review of the record and actions of the trial court which culminated in the foregoing recited judgment. Plaintiff comes here by appeal asking a reversal of the judgment and an entry of a judgment in this court in its favor for the total amount of the 50 checks in suit, with interest.

The case is what plaintiff's proofs make it, no questions being raised upon the pleadings. The circuit court instructed a verdict on the theory that the proofs of the plaintiff, when it rested its case, raised only questions of law for the conclusion of the court and not of fact for determination by the jury. With this attitude of the court we are in harmony, but for reasons hereinafter set forth in this opinion, we disagree with the legal conclusions at which the trial court arrived in its finding and judgment. The material facts developed by plaintiff's proofs are not in controversy.

These facts, as culled from defendant's statement of the case, found in its brief, are substantially as follows:

The checks involved in this suit are 50 in number, and were all drawn by the United States Cold Storage Company, the plaintiff, in favor of various individuals, who, according to the testimony hereinafter recited, were plaintiff's customers, to whom checks were given during the course of business, with the exception of the

James check, as to which James stated that he never knew of any checks coming to him and never had any credit with plaintiff. Notwithstanding this statement of James, Newman, the vice president of plaintiff, testified that in their business dealings with James about that time he signed many checks to him and at the time of signing the particular check in question there was attached to it "a memorandum or data or information," and that no other checks were produced to corroborate Newman's testimony as against that of James. (However in the decision to which we have arrived the dispute between James and Newman is not material as the check was drawn to the order of "Edwin G. James.")

It is in evidence that one Arnold P. Meister was plaintiff's chief clerk and had charge of its office; that beginning with June 3, 1923, Meister caused the names of the payees to be placed in the checks, although they did not have any of the amounts specified in the checks coming to them as disclosed by their testimony. Fifty checks were introduced in evidence bearing dates from June 3, 1923, to October 25, 1924. The names of all of the payees of the checks were forged by indorsement thereon by Meister, which after going through the hands of various parties reached the defendant bank, who paid them in faith of the forged indorsements being genuine, and the bank at the end of each month thereafter made a statement of its account to the plaintiff. This procedure covered a period of about 15 months, during which Meister worked his forgery scheme.

The method of plaintiff in making up and issuing the checks was as follows: There were several sources of origin in the office where the checks started. Whoever was on duty as writer of the checks, or vouchers as they are sometimes named, made out the checks on a typing machine; instructions were given to the typists by the voucher writer with authority; this person was

usually Meister, the chief clerk; a carbon of each check was made and initialled by the department head, and on this initialling or O. K. the check was signed by those who had authority to do so. The checks that went through the office department came under Meister, and on them his initials were signed. No further investigation was made by the other signers except that on the vouchers there would be a memo of some sort showing some sign of whoever O. K.'d them, and this information was supposed to be taken from the books of the company. Meister's duty was to supply the name of the payee with supporting information taken from the company's books; those who were authorized to sign checks did so on receiving the O. K. by Meister and supporting data without any further inquiry, so that for this corporate act of plaintiff three persons acted, Meister in making out the checks, and two others in signing them. Albert D. Viele was the general bookkeeper and one of those authorized to sign the checks. The others were Trask, Allman and Newman, and two signatures out of the four were sufficient, but there had to be two. Viele's duties were handling the general accounts, and making up profit and loss statements. He testified that he had no payable accounts and had no books for accounts payable; that he had no memorandum of any kind for accounts payable, and got the memorandum as to whom the money was coming from the departments which would bring bills for payment. The loan department handled advances for products coming into the warehouse to be stored for the account of others, and what was thus owed shows in the loan ledger. Viele further testified that that is not where they got the data from to make checks to pay people. This leaves the information as to where Meister got his supporting data undisclosed. Viele made a permanent record of every voucher in their order on the voucher book. The check that goes to the

customer has a memo attached as to what the payment is for. It is a conceded fact that the names of the payees in all of the 50 checks were indorsed upon the checks by Meister, and that such indorsements were forgeries committed by Meister.

Defendant argues in its brief: "So for the performance of this one act by the corporation it was necessary that three persons act, Meister who designated the payee, the two others who affixed the signature. If these two affixed the signature to a check where Meister did not O. K. it, their act would be outside of their authority."

By parity of reasoning, so was Meister's act outside of his authority when he made checks payable to persons to whom the plaintiff was not indebted. Meister's authority was limited to the drawing of checks payable to the order of creditors of plaintiff. There is no evidence which would warrant the inference that Meister was authorized to draw checks to the order of anyone but those to whom the plaintiff was indebted. That was the limitation of Meister's authority as shown by the evidence. And counsel further argues: "It follows, therefore, that the act of Meister in thus designating the payee, was the act of the corporation." This is not a logical deduction from the proofs. Meister had no authority to make checks payable to anyone to whom the plaintiff was not indebted.

Defendant contends in an effort to sustain the judgment in its favor that "the checks in question were payable to living persons not intended to have any interest therein and were, therefore, payable to bearer," and cites section 9, Cahill's St. ch. 98, ¶ 29; and further contends that "the plaintiff drew these checks not intending that the payee should ever have possession thereof or any interest therein. The payees, therefore, were in law, fictitious persons, and the checks, being in law, payable to bearer, were trans-

ferable by delivery. The bank, therefore, had the right to enforce them against the maker without having to claim title through a forged indorsement.'' In support of that doctrine they cite *Bartlett v. First Nat. Bank of Chicago,* 247 Ill. 490, and quote from the *Bartlett* case the following:

''Where a grain company's agent draws drafts on the company payable to real persons or bearer, not intending that the payees should ever have possession of the drafts or any interest therein, or that they should indorse them, but intending to indorse such names himself, the payees are, in law, fictitious persons, and the drafts, being, in law, payable to bearer, are transferable by delivery, so that a bank which pays them may enforce them against the drawee without having to claim title through the agent's forged indorsement.''

The infirmity in this contention, we think, lies in the assumption that the checks on which the names of the payees were forged by Meister were the checks of plaintiff. It will readily be seen that the plaintiff had no intention that the checks should be payable to fictitious persons. That was the act of the criminal employee, the forger of the payees' names, and done without any authority or direction of his employer, the plaintiff. The whole argument of counsel is based upon the assumption that the criminal act of Meister was that of the plaintiff corporation, and that the plaintiff intended that the payees should be treated as fictitious persons, whereas, the proofs demonstrate conclusively and undisputedly that they were real persons, all of whom at some time theretofore had business dealings with the plaintiff.

The contention is made that the payees of the checks were fictitious persons, and therefore that they were payable to bearer, in force of section 9 of the Negotiable Instruments Act, *supra,* where it is provided that: ''The instrument is payable to bearer . . .

when it is payable to the order of a person known
by the drawer or maker to be fictitious or non-existent
or of a living person not intended to have any interest
in, it. . . .'' The proofs show undisputedly, except
as to one of the payees, that they all were going con-
cerns and had business transactions with the plaintiff,
and the books of the plaintiff in evidence so demon-
strated. How can it in reason be contended that the
payees of these checks were known by the plaintiff
to be fictitious or nonexisting or living persons not
intended to have any interest in the checks? It was
not even the intention of Meister that the payees should
be regarded as fictitious persons, because he forged
their names as indorsers of the checks. Meister's in-
tention was to forge the names of the payees and this
he did, and the payees were all persons not only doing
business with the plaintiff and known to the officers
of the plaintiff corporation, but all the payees of the
checks in question had before the making of the checks
in dispute received checks in a business way and
through business dealings with the plaintiff. There
was no intention on the part of the plaintiff that the
payees should be regarded as fictitious persons. That
was the criminal intention and action of Meister. Fur-
ther the checks were not treated as being payable to
fictitious persons or to bearer. The names of the
several payees were indorsed upon the several checks
by Meister, the forger, and for the payment by the,
defendant bank of the checks with the forged indorse-·
ment the bank is liable to plaintiff.

We think the reasoning of the case of *Shipman v.
Bank of the State of New York,* 126 N. Y. 318, is more
analogous to the case at bar than is that of the *Bartlett*
case, *supra.* In the *Shipman* case the court said:

''We are of the opinion, upon examination of the
authorities cited by counsel on both sides, that this
rule applies only to paper put into circulation by the

maker with knowledge that the name of the payee does not represent a real person. The maker's intention is the controlling consideration which determines the character of such paper. It cannot be treated as payable to bearer, unless the maker knows the payee to be fictitious and actually intends to make the paper payable to a fictitious person.''

And then this *dictum* of the court follows:

''Bedell (the employee who signed the names of the payee) of course knew that the payees were fictitious, but he was not acting within the scope of his employment, but in carrying out a scheme of fraud upon the plaintiffs, and under such circumstances his knowledge cannot be imputed to his principals.''

That reasoning applies with equal force to Meister, plaintiff's dishonest employee. And in *Seaboard Nat. Bank v. Bank of America,* 193 N. Y. 26, the court said:

''The secret intention of a criminal, contrary to his express intention, and the avowed purpose for which he obtains possession of a draft, does not give the criminal ownership of the draft, or the legal right to change a draft, payable to a real payee to one, payable to bearer. There is no presumption arising from the facts proven that the name of 'Carroll Brothers' was intended as a fictitious or nonexisting payee. Such intention, to be effective, must necessarily arise from knowledge and exist as an affirmative fact in the mind of the drawer of a draft at the time of its delivery.''

And so in the case at bar there is no presumption arising from the disputed facts in the record that the names of the several payees in suit were intended as fictitious or nonexisting payees. Plaintiff had not even a suspicion that Meister was acting illegally, and had no knowledge of his forgeries until these forgeries were subsequently discovered and Meister had fled.

We think that the *Bartlett* case, *supra,* is readily distinguishable from the case in hand, because, as we

read the opinion, the ultimate decision of the case went off on an entirely different ground, which was the negligence imputable to Bartlett in making it possible for his agent, Walsh, to commit the forgeries which he did. On this point the court said:

"We think, however, the undisputed evidence in this record shows that the negligence of the appellants was so gross that they ought not, as a matter of law, to be permitted to recover from the First National Bank of Chicago the amounts of the drafts upon which the names of the farmer payees were forged by R. L. Walsh, who was the agent of the appellants. The appellants knew their agent, R. L. Walsh, was drawing drafts against them with which to obtain money from the banks to pay for grain which he was buying upon their account, and that Walsh was wrongfully endorsing the names of the payees in whose favor said drafts were drawn, upon said drafts. They knew that Walsh was short upon grain which he had purchased for them, and they also knew that Walsh persisted in drawing drafts and endorsing them in the names of the payees after they had forbidden him to do so. While in possession of this information they retained him in their employ, and permitted him to continue drawing and endorsing said drafts without informing the banks who were handling such drafts of the fact that Walsh was wrongfully endorsing those drafts.

"When one of two innocent parties must suffer loss by reason of the wrongful acts of a third party, the rule is almost universal that the party who has made it possible, by reason of his negligence, for the third party to commit the wrong must stand the loss. In this case, if the appellants had notified the banks who were handling said drafts that R. L. Walsh was forging the names of the farmer payees in order to get the money on the said drafts from the banks, the loss which was sustained by the passing of said drafts would

never have occurred. This they did not do, but remained quiet so long as they thought they were getting the benefit of the money that was paid on said drafts, and only complained when they learned that their agent, Walsh, was taking advantage of the position in which they had placed him by his appointment as their agent, with authority to draw drafts, by drawing drafts to farmers who had not delivered grain, and endorsing the names of such farmer payees upon the drafts and drawing the money from the banks thereon and appropriating the same to his own use. We think it clear if the appellants enjoyed the benefits which accrued to them from the business done by Walsh so long as it was done honestly, that when Walsh became dishonest and appropriated the money which he drew by reason of forged endorsements they should suffer the loss which followed his rascality, and not be permitted to unload such loss upon the banks that innocently handled said drafts.''

Answering defendant's insistence that the checks in suit were binding on plaintiff as its own, and that the knowledge of Meister of the irregularity in the checks was imputable to plaintiff, it is the law that the controlling factor is the knowledge of the maker of the checks, and that the further test is the intention of the maker of the checks. There is no evidence in the record charging plaintiff with knowledge that the checks were payable to a fictitious person, nor that it was the intention of the maker of the checks that they should be paid to persons other than the payees, **nor** is the intention of Meister imputable to plaintiff.

In Daniel on Negotiable Instruments, vol. 1, p. 188, 6th Ed., it is said:

''A fictitious person is one who, though named as payee has no right to the instrument because the drawer of it so intended. . . . Under the statute, in order for such an instrument to be payable to bearer,

the fact that the payee is a fictitious or nonexisting person must be coupled with the knowledge of the person making it.''

In *Seaboard Nat. Bank v. Bank of America, supra,* the court quotes from Selover on Negotiable Instruments Law as follows:

''The doctrine that a check or bill made payable to a fictitious person is payable to bearer, and negotiable without indorsement if the fictitious character of the payee was known to the parties, originated in England, and in each of the cases holding the doctrine the decision was based on the fact that the acceptor knew, at the time of his acceptance, that the instrument was payable to a fictitious person. If the drawer or maker of an instrument did not know that the payee was a fictitious or nonexistent person, and did not intend to make the paper payable to such person, paper payable to the order of such person cannot be treated as payable to bearer, for the intention of the maker or drawer is the test.''

And likewise cites Eaton & Gilbert on Commercial Paper, and quotes the following:

''Under the common law a bill payable to a fictitious person or his order was neither in effect payable to the order of the drawer nor to the bearer, unless it was shown that the circumstance of the payee being a fictitious person was known to the acceptor. To show that the acceptor was aware that the payee was a fictitious person, evidence is admissible of the circumstances under which he accepted other bills payable to fictitious persons.

''The fictitiousness of the maker's direction to pay does not depend upon identification of the name of the payee with some existing person, but upon the intention underlying the act of the maker in inserting the name. The rule as to an instrument payable to the order of a fictitious or nonexisting person applies

only to paper put in circulation by the maker with knowledge that the name of the payee does not repre--sent a real person. The maker's intention is the controlling consideration. It cannot be treated as payable to bearer unless the maker knows the payee to be fictitious, and actually intends to make the paper payable to the fictitious person.''

This court held in *National Surety Co. v. Halsted Street State Bank,* 246 Ill. App. 92, that forgery of the indorsement of the payee's name in a draft, the payee being a real person, does not constitute the draft payable to a fictitious person and subject to the provision of Cahill's St. ch. 98, ¶ 29, that instruments payable to fictitious persons are payable to bearer.

In *American Exp. Co. v. Peoples' Sav. Bank,* 192 Iowa 366, in which the trial court directed a verdict in favor of the defendant on the theory that the drafts in suit were payable to fictitious or nonexisting persons, the court reversed that judgment saying, *inter alia:*

''The plaintiff company, as drawer, intended that these drafts should be paid to the named payees, and not to the purchaser, Crozer, and it was not known by the drawer that these drafts were payable to the order of fictitious . . . payees. This being true, the drafts were not payable to bearer.

''Were they payable to Crozer himself, so that his endorsements of them are valid? No doubt he intended them to be so payable, although he indorsed by writing the names of the payees. . . . In other words, Crozer himself intended to be the payee, but the drawer did not intend to make him so. If, in fact, there was a genuine firm, it alone could indorse; if there was not a genuine firm, then nobody could endorse. The drafts would not be payable to bearer, because the drawer did not know that the payees were fictitious or non-existing. They would not be payable to Crozer, because the drawer did not intend that the drafts should be so payable. . . .

"The intent of the drawer is the test, and this inten-tion must necessarily arise from knowledge, and exist as an affirmative fact in the mind of the drawer at the time of the delivery of the paper."

In *National Union Fire Ins. Co. v. Mellon Nat. Bank,* 276 Pa. St. 212, the court said:

"In addition to this, the fictitious or nonexisting persons must have been known to the drawer of the drafts to be such, before the result contended for could operate on the instruments, but the drawer knew no such thing, but just the opposite, that each of the payees was a real, existing person named as the insured in the policy of insurance issued by the drawer of the draft."

In *Grand Lodge of Kansas A. O. U. W. v. Emporia Nat. Bank,* 101 Kan. 369, it was said:

"The Grand Lodge did not know that Alice Evans was a fictitious person. It supposed that she was an existing person, and issued the order to that person. When a negotiable instrument is knowingly issued to a fictitious person, it is payable to bearer because there is no one to endorse it; but when such an instrument is issued to a person supposed to be in existence, it is not knowingly issued to a fictitious person. When the instrument is not knowingly issued to a fictitious person, it must be endorsed by the person to whom it is issued. The order issued to 'Alice Evans' was not payable to bearer."

By parity of reasoning the checks in question were not payable to a fictitious person but to a person named, which checks must be indorsed by the persons named and to whom they were issued. This mode of procedure cannot be dispensed with.

In *Harmon v. Old Detroit Nat. Bank,* 153 Mich. 73, it was held that making checks, drawn in favor of fictitious persons, payable to bearer, has application only to cases in which the drawer knowingly draws the

check to the order of a fictitious payee, and does not apply to a case where a trusted employee of a railroad company fraudulently erased the name of the proper payee to a valid warrant and substituted the name of a fictitious person. *City of St. Paul v. Merchants' Nat. Bank,* 151 Minn. 485; *National Surety Co. v. National City Bank of Brooklyn,* 184 App. Div. 771, 172 N. Y. Supp. 413.

In *Hamlin's Wizard Oil Co. v. United States Exp. Co.,* 265 Ill. 156, the court said:

"If one permits another to clothe himself or to be clothed with apparent authority to act as his agent, any person who has been induced to rely and act upon the appearance of authority can invoke the estoppel. That was the basis of the decision of *Bartlett v. First Nat. Bank of Chicago,* 247 Ill. 490."

The bank paying a check on a forged indorsement is liable to the maker of the check for the amount thereof. *Robertson Banking Co. v. Brassfield,* 202 Ala. 167, in which it is said:

"It is undisputed that the check in question was made payable to a fictitious person; but, in order for the defendant to have treated it as payable to bearer, the burden was upon it to show that Brassfield, the drawer knew that Johnson, the payee, was a nonexisting person." Citing *Boles v. Harding,* 201 Mass. 103.

In *Jordan Marsh Co. v. National Shawmut Bank,* 201 Mass. 397, the court said:

"The question arises whether the making of a check payable to a fictitious or nonexisting person, through negligent failure to discover the fraud by which the check is obtained, stands differently from making a check to an actual person, in reference to its effect upon payment by the defendant. We are of the opinion that there is no difference in law. In either case it is the duty of the bank to see that there is a genuine endorsement."

And in *Shipman v. Bank of the State of New York,* *supra,* the court said:

"The law imposed no duty upon the plaintiffs to do more than they did to ascertain whether the endorsements on the checks were genuine. The defendants' contract was to pay the checks only upon a genuine endorsement. The drawer is not presumed to know, and in fact seldom does know, the signature of the payee. The bank must, at its own peril, determine that question. It has the opportunity, by requiring identification when the check is presented, or a responsible guaranty from the party presenting it, of ascertaining whether the endorsement is genuine or not. When it returns the check to the depositor, as evidence of a payment made by his direction, the latter has the right to assume that the bank has ascertained the fact to be that the endorsement is genuine."

The forgeries were discovered on October 28, 1924, and on that date the defendant bank was notified of the discovery. The plaintiff is therefore entitled to interest at the statutory rate of 5 per cent from the last-mentioned date to the time of payment. Cahill's St. ch. 74, ¶ 2; *Schwitters v. Springer,* 236 Ill. 271.

The checks in suit were not payable to a fictitious person or to bearer, but to payees named, and the defendant bank having paid those checks on forged indorsements is liable to pay the same with interest to the plaintiff, and the plaintiff was not guilty of any negligence which affects its right of recovery.

For the errors indicated in this opinion the judgment of the circuit court is reversed and a judgment is entered here for plaintiff for the sum of $5,070.19, together with interest at 5 per cent from October 28, 1924, to the date of the filing of this opinion, January 30, 1929, making the total sum for which judgment is here entered in favor of the plaintiff of $6,148.97.

*Judgment reversed and judgment here for plaintiff for $6,148.97.*

WILSON and RYNER, JJ., concur.