UNITED MOTOR CAR CO. v. MORTGAGE & SECURITIES CO., INC.

(May 19, 1930.  Opinion and Decree.)

H. L. Hammett, of New Orleans, attorney for plaintiff, appellant.

Manning W. Heard and Wm. W. Ogden, of New Orleans, attorneys for defendant, appellee.

JANVIER, J.  Charles F. Muller was the acting head of the loan department of Mortgage & Securities Company, Inc.  He had no authority to sign checks for the corporation, but, as head of his department, it was his duty to approve certain payments in which his department was interested and, upon receipt of his approval in the form of a written voucher, the necessary check was signed by other employees or officers.

The Mortgage & Securities Company, Inc., for some time prior to the events which gave rise to this suit, had, through its loan department, been managing what was known as the "Duggan Estate" and had, in connection with that estate, made payments to one E. H. Johnson, a plumbing contractor of Baton Rouge.

Though at the particular time in question no payment was due Johnson, and though all payments made him theretofore had been very modest in amount, Muller executed the necessary approval voucher for the issuance of a check payable to Johnson for $800.

This check, after being executed on behalf of Mortgage & Securities Company Inc., by J. M. Miller, its vice-president, and F. N. Ogden, manager of its bond department, was, in due course, placed on Muller's desk ostensibly for delivery to Johnson, named as payee.

Muller thereupon indorsed Johnson's name upon the check after writing the words "Pay to the order of C. F. Muller."

Being desirous of purchasing an automobile, Muller then proceeded to the place of business of plaintiff on June 5, 1926, and, after selecting a car suitable to him, gave to plaintiff the check to which we have referred, as payment on account of the purchase price.

Plaintiff thereupon deposited the check with Canal Bank & Trust Company, which institution sent it to the Whitney Bank, on which bank it was drawn and by which it was in due course paid.

During the early part of August, 1926, Mortgage & Securities Company, Inc., discovered that Muller was guilty of certain defalcations, and an investigation and audit of the affairs theretofore handled by him was commenced.

As a result of this investigation, it developed that the check in question should not have been executed; that neither the amount thereof nor, in fact, any other amount, was due to Johnson; and that the indorsement was a forgery executed by Muller. In the meantime the automobile had been seized and sold at the instance of another creditor of Muller, but plaintiff although present at the sale, because of its custom of being represented at all sales of automobiles formerly sold by it, made no attempt to protect itself by bidding in the automobile because it did not know that it was interested by reason of the fact

that the $800 payment made to it depended upon a forged indorsement.

On November 13, 1926, the Whitney Bank was notified that the indorsement was a forgery. That bank called upon the Canal Bank & Trust Company for reimbursement, which was forthcoming, and Canal Bank & Trust Company thereupon charged the account of plaintiff with the amount thereof, after notifying it that it itself had been notified that the indorsement was forged.

This suit is the result.

It is charged that Mortgage & Securities Company, Inc., which, we note, has since been placed in the hands of a receiver, is liable to petitioner on two grounds:

First, that the check was payable to a fictitious person, known to be such to the agent who issued it, and was therefore in reality payable to bearer, and that thus, under the Negotiable Instruments Law (Act No. 64 of 1904), title thereto passed to a bona fide third holder, even without endorsement; and,

Second, that the negligence of defendant in not properly safeguarding the issuance of its checks, and later in not promptly notifying plaintiff of the discovery of the forgery, rendered it liable, regardless of whether title to the check passed by mere delivery.

Defendant, on the other hand, contends that the check was not payable to a fictitious payee, and that, even if it could be so considered, nevertheless it cannot be charged with knowledge of the fact that the payee was fictitious, and that, in the absence of such knowledge, the instrument cannot be considered as payable to bearer.

Defendant also maintains that it notified the Whitney Bank as soon as it discovered the forgery; that it discovered it as soon

as it was reasonably possible for it to do so, and that therefore it was not guilty of laches in this regard; and that the fact that plaintiff failed to protect itself by buying the car at the sheriff's sale instigated by another creditor of Muller, if such is a fact, is so remote a consequence of the delay, if there was in fact delay, that it cannot be chargeable as a matter of law to that delay. It was conceded that E. H. Johnson, named as payee, was an existing person, and that plaintiff, when it accepted the check, made no investigation to determine whether the indorsement thereon was genuine, and it is thus argued that the real cause of plaintiff's loss was its failure to investigate in an effort to determine whether or not the endorsement of Johnson was genuine.

We do not think that it can be said that the check was payable to a fictitious payee in the sense contemplated by the Negotiable Instruments Law, and we therefore feel that it should not be treated as an instrument payable to bearer, primarily because the payee named actually existed, and also because the persons who issued the check on behalf of defendant did not know that it was intended to be drawn for the benefit of any other person than Johnson, with whom and with whose connections with the institution they were familiar.

"It cannot be treated as payable to bearer unless the maker knows the payee to be fictitious, and actually intends to make the paper payable to a fictitious person." Seaboard National Bank vs. Bank of America, 193 N. Y. 26, 34, 85 N. E. 829, 831, 22 L. R. A. (N. S.) 499.

In the footnotes on page 180 of Corpus Juris, vol. 8, we find the following:

"This rule (that paper payable to a fictitious person is payable to bearer) applies only to paper put into circulation by the maker with knowledge that the name of the payee does not represent a real person. The maker's intention is the controlling consideration which determines the character of such paper. It cannot be treated as payable to bearer unless the maker knows the payee to be fictitious, and actually intends to make the paper payable to a 'fictitious person.' * * * There are authorities to the contrary in this country, but the clear weight of authority in both England and the United States is in favor of this rule."

In a case surprisingly similar to that before us, Los Angeles Investment Co. vs. Home Savings Bank, 180 Cal. 601, 182 P. 293, 295, 5 A. L. R. 1193, in which the facts as set forth in appellee's brief were that "one Emory, manager of the insurance department of plaintiff, requested the accounting department to issue checks in payment of premiums due to agents of plaintiff and upon receipt of the checks Emory endorsed them in the name of the ostensible payee and then endorsed his own name and secured the payment," the court said:

"It is also true that the payee named in several of the checks had no existence in the mind of Emory, and that the payees named in all of the others with one exception * * * were persons to whom Emory did not intend the checks to come. As to Emory, the payees, with the single exception noted, were all fictitious. The question is: Were they fictitious as to the plaintiff company? The answer to this question obviously depends upon whether Emory's intention that the checks be made payable to persons who were not to receive the paper * * * is attributable to the company. The bank's counsel in their brief say: 'But appellant did intend something when it issued the checks. What was it? It intended that the money be paid to the person to whom Emory intended it to be paid—and the money was so paid.'
"This is the very crux of the matter. But is it true? Plainly it is not. Emory did not execute the checks on behalf of the company. It is the intention of the officers who did that must be taken to be the intention of the company. The execu-

388

tion of the checks was one within the scope of their authority, not within that of Emory. As to these officers, it is plain that they did not intend to execute checks to fictitious parties or to pay money to the person to whom Emory intended it should be paid, to-wit, himself. They intended to pay money to what they believed to be existent persons, and, this being so, the checks cannot be considered as made to fictitious payees."

Nor do we believe that it makes any difference that, in all probability, these officials would readily have signed the check had it really been payable to a person who did not exist, but who was certified by Muller to be entitled to it, because we recognize that modern business demands that trust and confidence be placed by corporations in their various officials, and we believe that the following doctrine, enunciated in Los Angeles Investment Co. vs. Home Savings Bank, supra, is entirely sound:

"Complaint is chiefly made that the company relied upon the honesty of its heads of departments and the regularity on their face of the demands or requisitions which such heads approved, and made no investigation to determine whether such demands were fraudulent or not. But trust must be placed in some one (Kohn v. Sacramento Electric Co., 168 Cal. 1, 141 P. 626; The Yamato v. Bank of Southern California, 170 Cal. 351, 149 P. 826), and necessarily in heads of departments. If trusting them in regard to demands for checks for disbursements regular upon their face is negligence, so it would be negligence to trust them in a hundred other ways in which it is within their power to defraud their employer. Business could not be conducted on any such basis. It is impossible for any large concern' to investigate minutely in advance every demand for disbursement necessary for it to make in its daily business. The delay and expense of so doing would be too great."

It is said by counsel for plaintiff that there are no Louisiana decisions involving the question presented here. So far as we have been able to discover, he is correct in this statement, but we cannot agree that the law of other jurisdictions is in so unsettled a state as he suggests.

The decisions on which he mainly relies, Litchfield Shuttle Co. vs. Cumberland Valley National Bank, 134 Tenn. 379, 183 S. W. 1006; Equitable Life Assurance Society vs. National Bank of Commerce (Mo. App.) 181 S. W. 1176, and Snyder vs. Corn Exchange National Bank, 221 Pa. 599, 70 A. 876, 128 Am. St. Rep. 780, were rendered in cases in which the person drawing the check had full authority to do so and did so knowing that it was not intended to go to the person named as payee, or in which the payee named was a purely fictitious person.

Here Muller did not draw the check, and the officials who did do so were justified in believing that it was really intended for Johnson, who was a real person and who had had dealings with their institution.

The loss resulting from the forgery of an indorsement properly falls on him whose claim to the instrument depends upon the indorsement, and it is his duty, before accepting from one person a check payable to another, to investigate and determine whether it bears the genuine indorsement of that other.

As was said in Jordan Marsh Co. vs. National Shawmut Bank, 201 Mass. 397, 87 N. E. 740, 742, 22 L. R. A. (N. S.) 250:

"If one is fraudulently induced to deliver to a person who is not entitled to it a check made payable to another person who is not entitled to payment of it, can his negligence in suffering the fraud to be practiced upon him be found to be a direct and proximate cause of a payment made by the banker on whom the check is drawn, upon a forged indorsement of the name of the

payee, without any investigation by the banker as to the genuineness of the indorsement? We think not. The check is like any other check payable to a real person which happens to be in the possession of another person. It is possible to forge an indorsement upon it, as it is to forge an indorsement upon any other check. * * * But the whole duty of seeing whether there is a forgery of such an indorsement upon any check rests primarily upon the banker. The drawer of the check has nothing to do with that."

That plaintiff was not sooner notified that the indorsement on which it relied for the title to the instrument was a forgery is an unfortunate circumstance, but one which, it appears to us, cannot be charged to defendant.

It is true that if a bank pays a check on a forged signature of the supposed drawer it is the duty of the drawer, within a reasonable time after the return of the instrument, to notify the bank of the forgery. That even in the case of the forgery of the signature of the maker it may take some time to discover the forgery is recognized by the Legislature, and therefore, under Act No. 44 of 1912, the drawer is given one year to notify the bank of such forgery. But no such duty exists in the case of a forged indorsement. So far as we know, it is entirely possible that a forged indorsement may not come to light for an indefinite period, and, unless it can be shown, as we do not think it was shown here, that there was some duty to discover the forgery sooner than it was discovered, the person who has been defrauded may call upon the bank which has paid the check upon a forged indorsement for restitution whenever the discovery of the forgery is made.

The rule set forth in Sprague vs. West Hudson Trust Co. et al., 92 N. J. Eq. 639, 114 A. 344, 345, 17 A. L. R. 952, appears to us to be sound:

"We are quite unable to see any equity in favor of complainants. It is true that Swift & Co. owed it to their bank, after return of their paid checks, to exercise reasonable diligence and care to examine the vouchers and the account as stated by the bank, and inform it of any errors thus discoverable. (Authority cited.) But we have never heard that this duty extended to others than the bank. Persons into whose hands a check may come before payment take the risk of forged signatures and forged indorsements, preceding their own. * * * There was no privity between them (Complainants) and Swift & Co. All that the latter were interested in was that the bank should not pay out money on their account improperly; and, if it did so, the question whether it should respond to Swift & Co. is one in which complainants would seem to have no legal or equitable interest. We have seen that a bank which has paid on a forged indorsement may in some case defend against its depositor on the theory of negligence; but we have never heard of this rule being invoked in favor of any one but the depository bank. Its contract with the depositor is to pay its debt to him when and as demanded by checks upon it. * * * The claim of estoppel set up in the brief rests on the notion that Swift & Co. owed the public, including complainants, some duty of care in examining their own accounts and returned vouchers. We know of no such rule."

But the record convinces us that all reasonable diligence was exercised in investigating the defalcations of Muller, and that, after the discovery of the particular forgery involved here, the bank was notified with reasonable promptness, and that defendant cannot be held liable on this ground.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is amended so as to read in favor of Guy Hopkins, receiver of Mortgage & Securities Company, Inc., and that, as thus amended, it be affirmed at the cost of appellant.