## HARTFORD ACCIDENT & INDEMNITY CO. v. FIFTH THIRD UNION TRUST CO.

### No. 4985.

District Court, S. D. Ohio, W. D.
April 11, 1938.

54

Robert Adair Black, of Cincinnati, Ohio, for plaintiff.

Maxwell & Ramsey and Gregor B. Moormann, all of Cincinnati, Ohio, for defendant.

NEVIN, District Judge.

This is an action at law wherein plaintiff prays judgment against defendant for the sum of $6,000, with interest thereon from August 26, 1935. The cause came on for trial on April 28, 1937, before the court and jury. After all the testimony had been offered, counsel for both sides moved the court to direct a verdict, each side respectively moving, without reservation, that the verdict be directed in its favor. It is agreed that thus the case is submitted to the court for its determination. Anderson v. Mes-

senger, 6 Cir., 158 F. 250, 253; Thomas-Bonner Co. v. Hooven, Owens & Rentschler Co., 6 Cir., 284 F. 386, 392; Williams v. Vreeland, 250 U.S. 295, 39 S.Ct. 438, 63 L. Ed. 989, 3 A.L.R. 1038; Baltimore & Carolina Line, Inc., v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636.

. There is no controversy as to the basic facts. The difference between the parties arises from the inferences to be drawn from these facts and the applicable law. In substance, the facts, either as admitted in the pleadings or proven, are as follows: On or about January 29, 1934, one Albert Keniston had and asserted a claim against a man named Charles Heyde, on account of personal injuries which Keniston claimed to have received on August 26, 1933, due to the operation of an auto truck belonging to Heyde. Heyde was insured by the Phoenix Indemnity Company (New York)', which had agreed to indemnify him for such sums as he might be required to pay on account of a claim such as that presented by Keniston. The Phoenix Company had the right under its policy to settle directly with Keniston by way of compromise and settlement of his claim, if it so desired.

Harry Neal Smith, an attorney in Cincinnati, Ohio, was the Cincinnati representative, in the dual capacity of claim adjuster and attorney, for the Phoenix Indemnity Company, and had been such for approximately 15 years, preceding this action. During all that time, Smith had local charge of investigating and defending the litigation arising from claims against the Phoenix Company.

Smith also represented various other indemnity and casualty companies, aggregating as many as 14 at one time. His services for the other companies were similar to those which he rendered for Phoenix, and he was compensated therefor, by some of these companies, as also by the Phoenix Company, on a case basis.

Smith had done business with the Fifth Third (National) Bank, and continued to handle some business through the bank after it merged with the Union Trust Company forming the present defendant.

In this manner Smith became known to the bank, its officers and employees, including Mr. Eckermeyer, the teller, who received the deposit of the draft, involved in this case, which was drawn by Smith as adjuster on his principal, the Phoenix Indemnity Company.

Mr. Eckermeyer testified:

"Q. You knew he (Smith) was a law-yer? A. Yes.

"Q. That is all you knew about him? A. I saw his signature on drafts from time to time. My association with the bank there dates back over a period of years and Mr. Smith's signature was one that, having known him, I recognized it.

"Q. Do you mean you had seen other drafts and other transactions going through the bank? A. That is right."

On January 29, 1934, Smith called at the Fifth Third Union Trust Company, accompanied by Robert E. Jones, one of his employees, who investigated claims and accidents, and did general investigating work for Smith. Before approaching the window of Mr. Eckermeyer, the deposit teller, Smith had Jones prepare a deposit slip (Defendant's Exhibit A) listing a draft for $6,000. (Plaintiff's Exhibit 2), which Smith, as adjuster, had prepared and signed on a draft form selected from the stock of forms furnished him by his principal, the Phoenix Indemnity Company. The name of the payee inserted in the draft by Smith was Albert Keniston, the individual who, as hereinbefore stated, had been injured by a truck of Charles Heyde, an assured of the Phoenix Indemnity Company.

Smith signed the name of Keniston (but spelled thereon Kenniston) on the back of the draft, without the knowledge of the bank. At the time the draft was issued neither Smith nor the Phoenix Company had any agreement of settlement with Mr. Keniston (or Kenniston), and Smith had no intention of delivering the draft to him. As to this Smith testified:

"Q. Did you have any agreement of settlement with Mr. Kenniston at the time that you issued that draft for six thousand dollars? A. No.

"Q. Did you have any intention of delivering that draft to Mr. Kenniston when you issued it and signed his name? * * * A. No, I didn't."

After Jones had made out the deposit slip and indorsed his name on the draft, Smith and Jones walked over to the teller's window and entered into a conversation with the teller, Mr. Eckermeyer. The recollection of both Smith and Eckermeyer as to the gist of this conversation is substantially identical. Smith (and exactly to the same effect Eckermeyer) testified:

"Q. Will you state, Mr. Smith, what statements you made to Mr. Eckermeyer, the teller, in connection with this deposit, and what your conversation was there, the gist of it? I know you can't give the exact words but give the general gist and effect of it. A. Mr. Eckermeyer asked Mr. Jones and I first who Mr. Kenniston was, what this money was for, and I told him. Then he asked why we were collecting the money in this way, or why we were depositing it in this account, and we told him—or I told him, rather, that we were going to collect the money for Mr. Kenniston. He then said 'You can't use this money or have any part of it for at least'—my recollection now is he said about five days, because the draft would not be collected or paid in New York until that lapse of time. After that conversation Mr. Eckermeyer looked up this account of Robert E. Jones. He had a little deposit book which showed a small balance of a few cents, and he went back, I think to the back end of the bank, and verified the existence of that account. Then he came back and entered the deposit in the book and gave us back the book. Then we walked back to the middle of the room, the banking room, and wrote out the check, the check to either Mr. Kenniston or myself, for fifty-nine hundred dollars.

"Q. That check was not then delivered to the bank, was it, the fifty nine hundred dollar check? A. No, That check I retained for a lapse of time, approximately seven days.

"You had Mr. Jones sign that check, though, before you left the bank that day? A. Yes, we did that immediately after we had the deposit entered in this little book, we walked back to the center of the banking room, the counter, and made out the check.

"The Court: That was a transaction between you and Mr. Jones, however? A. Yes.

"Q. The bank had nothing to do with that?

"The Court: The bank knew nothing about that, as I understand it.

"A. No, the bank knew nothing about that.

"Q. Mr. Smith, state whether or not any reason was given by you for getting the cash for Mr. Kenniston instead of letting Mr. Kenniston put the draft through himself. * * * A. Yes, I explained or gave him a reason why we were collecting the draft in that way.

"Q. What was the reason that you gave him? A. As I recall now, we told Mr. Eckermeyer that Mr. Kenniston had no bank account, no means of collecting this money, and that he desired to collect it and receive it personally and not have this draft in his possession."

As stated, the testimony of Mr. Eckermeyer confirms Smith's recital as to this conversation. Mr. Eckermeyer further testified:

"Q. Now, after you received this deposit slip did you examine the Six Thousand dollar draft, which is referred to on that slip? A. Yes, sir.

"Q. Did you make any other notations on this slip besides placing your stamp on the face of it? A. Well, an item of that type, I mentioned on the back the maker of the check, that is, the company and the actual bank that it was drawn on.

"Q. You mean draft, not check?. A. The draft and the bank it was drawn on. Drafts and checks are handled alike. I mentioned the name in my own handwriting there, Phoenix Indemnity Company, Chemical Bank and Trust Company, New York. That would identify the item in case we would want to follow it up in any way."

The proof shows that the further effect of this notation was to hold up payment until the draft had "cleared," that is, was accepted and paid in New York by the Phoenix Company. It is conceded that the teller, Eckermeyer, did not honor or pay the draft on its presentation for deposit on January 29, 1934, but merely accepted it for collection.

At the same time that Smith drew and issued the draft, he prepared a letter of advice reporting the same to the Phoenix Indemnity Company, and inclosing the purported release of Albert Kenniston (or Keniston).

On January 30, 1934, the day after receiving the draft from Smith and Jones, the Fifth Third Union Trust Company indorsed it for presentment and collection as follows:

"Jan. 30, 1934.
"Pay to the order of any Bank, Banker or Trust Company. Prior restrictive endorsements guaranteed.
"The Fifth Third Union Trust Co.
"Cincinnati
"Ohio"

Upon its receipt of the draft through the Chemical Bank & Trust Company, the Phoenix Indemnity Company accepted the same as drawee, and issued its check to cover it and a number of other drafts which it had accepted at the same time.

After the Phoenix had honored the draft and the Fifth Third's collection thereof was completed, Smith obtained from Jones all the proceeds of the draft with the exception of $100, that Smith permitted Jones to retain in his account at the Fifth Third Union Trust Company.

Some months after Smith had sent Kenniston's purported release to the Phoenix Company and had presented the draft to the Fifth Third, the Phoenix Company discovered that Kenniston's name was forged by Smith both on the release and on the draft and that Smith had not paid over to Kenniston (or Keniston) the proceeds of the draft. It immediately notified the defendant bank and demanded payment from the bank of the $6,000, the amount of the draft. The bank refused, and has continued to refuse, to make such payment.

Subsequently the Phoenix Company settled the claim of Kenniston (or Keniston) against Heyde by paying to Keniston the sum of $7,500.

Plaintiff herein is a Connecticut corporation engaged in the business of writing various forms of insurance and indemnity agreements. It had a contract of indemnity —in force during the time involved herein —whereby it agreed to pay the Phoenix Indemnity Company such pecuniary loss as the Phoenix Company might sustain by forgery, the contract further providing that plaintiff herein should be subrogated to all rights accruing to the Phoenix Company by reason of loss sustained by any such forgery. The Phoenix Company therefore called upon plaintiff herein, Hartford Accident & Indemnity Company, to make good under its forgery policy the loss of $6,000 sustained by the Phoenix because of Smith's forgery of Keniston's name on the draft.

The Hartford Accident & Indemnity Company paid the $6,000 loss and, as assignee of the rights of the Phoenix Company, brought this action against the Fifth Third Union Trust Company to recoup said sum, which it had paid to the Phoenix Indemnity Company.

Upon the trial, plaintiff withdrew any claim arising upon the terms of the indorsement of defendant and admitted that the Phoenix Indemnity Company, as drawee, was not a holder in due course. Plaintiff claims, as stated by its counsel in his brief

(p. 3) "that the right of recovery assigned to it by Phoenix Indemnity Company was the common law action for money had and received as paid out upon mistake of fact, for the purpose of payment to Kenniston or his order, and therefore, title never passed as to such funds to defendant upon its receipt thereof."

1. Defendant asserts first, that the draft in question was drawn and negotiated by Smith as agent and adjuster of the drawee, the Phoenix Indemnity Company, and that, when it was negotiated, it was a bearer instrument, within the meaning of the provisions of Ohio General Code, § 8114; and that, if it is a bearer instrument, plaintiff cannot rely on indorsements thereon to support its interest in the draft, and that consequently its action must fail. Section 8114, G.C.O. provides—"The instrument is payable to bearer: * * *

"3. When it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable."

As stated by defendant, a draft may be said to have been drawn to the order of a fictitious person when the person drawing the instrument inserts the name of a real person but does not intend that such named person should receive such instrument, or any interest therein. The fictitious character of the payee is determined by the intention of the one making the instrument and not by the objective standard of actual existence or nonexistence of the payee. The controlling factor is the intention of the person making the instrument, that is to say, does he intend the payee to have any interest in the (in this case) draft. ·

As stated by the court in Phillips v. Mercantile National Bank, 140 N.Y. 556, at page 562, 35 N.E. 982, 983, 23 L.R.A. 584, 37 Am.St.Rep. 596, "The fictitiousness of the maker's direction to pay does not depend upon the identification of the name of the payee with some existent person, but upon the intention underlying the act of the maker in inserting the name." To the same effect, Norton et al. v. City Bank & Trust Co., 4 Cir., 294 F. 839, at page 844, wherein, in addition to a number of supporting authorities cited, the foregoing quotation is used with approval.

Counsel for plaintiff seeks to distinguish the Norton Case from the case at bar, saying (Br. p. 14 et seq.): "The (Norton v. Bank) case is decided upon the ground of fictitious payee, the Court saying, on page

844 of 294 F.: 'The law is now well settled that a negotiable instrument is drawn to a fictitious payee whenever the payee named in it has no right to it, and its maker does not intend that such payee shall take anything by it.' The case was decided under the Negotiable Instruments Act, but the Court found that its ruling was supported by common law. * * * The rule is not disputed by us as quoted. We are distinguishing the case at bar from any cited case, upon the following grounds: First: Smith had no general authority to draw drafts. He could neither determine amounts or select payees. He was only an amanuensis in executing the draft. Second: Kenniston had a real interest in the draft and could have asserted title to it, if he had known of it and if he had elected to settle his claim for the amount stipulated."

As to the first contention of plaintiff just referred to, it is true Smith had no general authority to draw drafts. He was however, more than "an amanuensis." He had authority from the Phoenix Company to draw a draft at the time in question. This is not controverted; as to it Smith testified "There was some correspondence with the Phoenix Indemnity Company both by letter and telegram and authority was given to issue draft for $6,000.00." When Smith made out the draft to Albert Kenniston, he acted within the scope of his authority.

As to the second contention of plaintiff above set out, the court is unable to agree that Keniston "had a real interest in the draft and could have asserted title to it." He never had a right to the proceeds of the draft in question. The claim now urged that if Keniston had known of the draft, he might have "elected to settle his claim for the amount stipulated" is more fanciful than real. This seems true especially in view of the since acquired knowledge that the Phoenix Company finally settled with Keniston by paying him $7,500. It is conceded that no settlement had been arranged with Keniston when the draft was drawn by Smith, and that as a matter of actual fact at that time the Phoenix Company had not yet admitted liability to him. It seems apparent therefore, that the claim that Kenniston had a "real interest in the draft" is without merit. The court is of opinion that the instant case falls within the rule laid down in the case of Norton v. Bank, supra, which rule (as above stated), counsel for plaintiff in their brief say "is not disputed by us."

There is a sharp difference between counsel as to the applicability to the instant case of Jones v. People's Bank Co., 95 Ohio St. 253, 116 N.E. 34. That case is cited here merely as a matter of reference. Whether it is "directly controlling" in the instant case as claimed by defendant, or whether it is not "authoritative" at all "for the reason that it is a per curiam decision and without syllabus" and "because on the facts it is in conflict with the weight of opinion" all as claimed by plaintiff, need not be discussed or determined here for the reason that, upon the facts of the instant case and under the authorities already cited, the court is of the opinion that in this case the draft was drawn and made payable to a fictitious payee and that this defense has been clearly established.

■ 2. The court is further of the opinion that plaintiff should not recover in this case under the law and upon the facts as shown by the record independently of the defense of "fictitious payee."

The facts in the instant case have heretofore been set out at considerable length. It would serve no useful purpose to repeat them here. It should perhaps be again pointed out however, that Harry Neal Smith, who actually made out and signed the draft in question was the adjuster and attorney for, and in the handling of the Keniston claim was the agent of, the Phoenix Indemnity Company. That company had trusted him to such extent that it had placed in his hands a book of draft forms and empowered him, as such agent, to draw the draft in question for $6,000 on one of the forms in his possession. The Phoenix Company accepted, from Smith, Kenniston's purported but forged release. Under these circumstances the Phoenix Indemnity Company must be regarded as having first trusted Smith and as having placed in his hands the means and clothed him with the authority which enabled him to commit the wrong. His plan was to defraud his principal, the Phoenix Indemnity Company.

The testimony heretofore quoted and the evidence as disclosed by the whole of the record shows that Mr. Eckermeyer, the teller at the bank, and therefore the defendant bank itself, did everything that could reasonably be expected or required under the circumstances. Smith was not a stranger to the bank officials. He accompanied Jones to the bank and, by his mere presence, as well as by statements (as shown in the evidence hereinbefore quoted), vouched for Jones. The explanation that he made about Keniston, to account for Keniston's absence, was entirely plausible, especially to a man like Mr. Eckermeyer, who had known him personally and who had known of his connections with indemnity and casualty companies for many years. It must be remembered that at that time there was no question as to Mr. Smith's integrity. He was trusted alike by the Phoenix Company and other indemnity and casualty companies and by the bank or banks where he or they transacted business. There is nothing in the record to show that at the time in question he was known as other than a lawyer in good repute in the community in which he lived and transacted business. Even then, the bank did not pay out the proceeds of the draft at once, but took it for collection and it was not until it had been honored by the Phoenix Company and approximately 7 days after the draft was first presented to Mr. Eckermeyer that the money was drawn by Smith from the Jones account. Certainly under such circumstances the well-established rule that "where one of two innocent persons must suffer by the fraud of a third person, he who first trusted such third person, and placed in his hands the means which enabled him to commit the wrong must bear the loss" is applicable. McHenry v. Old Citizens' National Bank of Zanesville, 85 Ohio St. 203, 97 N.E. 395, syllabus 1, 38 L.R.A.,N.S., 1111.

This rule was recently applied and followed by the Court of Appeals for the First Appellate District of Ohio, Hamilton County, in Central Trust Co. v. Eureka-Security Fire & Marine Ins. Co., 50 Ohio App. 308, 198 N.E. 62, 64—a case somewhat similar to the one at bar. In the Central Trust Case the court held that the real issue "grows out of the fraud perpetrated on the company by its own agents" and that in the last analysis to hold in favor of the insurance company would be to hold that the banks, by their indorsement of the draft, insured the principal against fraud perpetrated upon it by its own agents. See, also, Weisberger Co. v. Savings Bank, 84 Ohio St. 21, 31, 95 N.E. 379, 34 L.R.A.,N.S., 1100.

■ Upon a consideration of the whole of the record the court is of the opinion that under the circumstances the Phoenix Indemnity Company could not have recovered, and that by the same token plaintiff has failed to establish a case upon which it is entitled to recover. Had the case gone to the jury the court would have felt bound to have

sustained defendant's motion for a directed verdict in its favor. The rights of plaintiff are merely derivative. Its rights as assignee do not exceed those of its assignor, the Phoenix Indemnity Company.

The court finds, upon the issues joined, in favor of the defendant and against the plaintiff; that plaintiff's petition should be dismissed and that defendant should recover its costs herein expended, as prayed for in its answer.

Order accordingly.