WASHINGTON LOAN & TRUST CO. v. UNITED STATES.

RIGGS NAT. BANK OF WASHINGTON, D. C., v. SAME.

COLUMBIA NAT. BANK OF WASHINGTON v. SAME.

Nos. 8247, 8248, 8249.

United States Court of Appeals for the District of Columbia.

Argued Jan. 14, 1943.

Decided March 1, 1943.

Mr. George P. Hoover, of Washington, D. C., with whom Messrs. Arthur Peter, Frank J. Hogan, Nelson T. Hartson, and Walter B. Guy, all of Washington, D. C., were on the brief, for appellants.

Mr. Bernard J. Long, Assistant United States Attorney, of Washington, D. C., with whom Assistant Attorney General F. M. Shea and Mr. Edward M. Curran, United States Attorney, of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This is an appeal from three judgments entered by the District Court on verdicts of a jury rendered by direction of the Court in a consolidated action against three Washington banks.

On January 5, 1939, the United States brought three actions at law to recover from appellants $84,880.83 paid to them by the United States upon their presentation of 1072 United States Treasury checks bearing forged endorsements. The complaint in each case was in two counts, one alleging payment under a mistake of fact, the other payment upon guarantees by the Banks of the genuineness of prior endorsements appearing on the checks. A trial to a jury was begun, but at the close of the appellants' opening statement the Court directed a verdict for the United States.

A summary of counsel's opening statement is as follows:

In early 1933 the President issued a proclamation establishing Civilian Conservation Camps in various national and state parks throughout the United States. By executive order the Chief of Finance of the United States Army was made disbursing officer of funds allocated to the various camps. Five or six camps were established in the Shenandoah National Park in Virginia. Each of the camps, in addition to the enrollees, had a facilitating personnel, consisting of one superintendent and eight foremen. Stitely, the person responsible for the forgeries, was chief of the voucher unit of the accounts section of the National Park Service. His duty was to prepare bi-monthly payroll vouchers, containing the names of the employees in the service, present them to the disbursing officers of the Government, and receive and distribute the checks drawn by those officers to the order of the employees. From July 15, 1933, to March 31, 1937, Stitely made up fraudulent payroll vouchers for fictitious or non-existent employees of an imaginary CCC camp in the Shenandoah National Park. The fraudulent payrolls conformed to the regular payrolls, except that they were on what is called a "short form voucher". They, along with the legitimate long form vouchers, were taken by Stitely personally to the office of the Chief of Finance of the War Department each pay day. He explained to the disbursing officer that the short form voucher was used because the men whose names appeared on it were scattered around in different places in the Park and the amount of their compensation could not be determined until pay day, when the Park Superintendent came to Washington with the data. Stitely received from the Finance Officer the checks of both the persons on the legitimate and the persons on the fraudulent payrolls. The legitimate checks he delivered to the office of the Park Service; the spurious ones he retained, forged thereon the signatures of the payees, and either cashed or deposited them to his account in one of the banks. Both the legitimate and fraudulent payrolls were made up with an original and two copies. The original was sent to the General Accounting Office, one copy was retained by the Finance Office, and the second copy, which was supposed to be sent to the National Park Service, was in each instance got and destroyed by Stitely. Although the

War Department had inspectors whose duty it was to inspect the camps, Stitely's imaginary camp was not discovered until April, 1937. At that time another fund, out of which Stitely had been fraudulently withdrawing money, was discovered to be short. This induced a general examination of the camp finances and led to the discovery of Stitely's forgeries. He was indicted, convicted and is now serving his sentence.

Counsel's statement also included as facts to be shown the following:

There were, at the beginning of the operation of the camps, conferences between the Park Service and the Finance Office of the Army with a view to arranging some system of accounting between the two offices, but no agreement was reached. While the payroll vouchers bore certain symbols relating to procurement, purpose number, and designation of appropriation, they bore no symbol designating the particular park in which the camp was located, with the result that there was no appropriate means of checking against particular parks either the regular payroll vouchers or the fraudulent payroll vouchers. This condition continued, without proper books being kept, until a short time before the discovery of the forgeries. Stitely knew, counsel said, that the Park Service did not keep proper records and that it was unable to balance the books and consequently was bold in his wrongdoing. Stitely was, with the knowledge of the Disbursing Officer, in the habit of taking expensive trips to Florida, but always returned to be present on pay days. Stitely was a depositor in the West End office of one of appellants, Washington Loan and Trust Company, and each of the checks sued on in the cases of the Trust Company and the Columbia Bank, another of appellants, was either cashed or deposited by him in this office of the Trust Company. Because of the proximity of this office to many Government buildings, Government checks aggregating several hundred thousand dollars were normally cashed there on pay days, the common practice being for one Government employee to present the checks of other employees, sometimes to as many as ten or fifteen. Consequently, there was nothing unusual in Stitely's conduct, nor anything that might reveal to the bank dishonesty on his part. Counsel concluded that the frauds were made easy and possible by the improper methods adopted by the United States in protecting

its funds, as the result of which the banks were misled and induced to accept and pay the checks.

■ It is conceded, of course, that on this appeal the facts stated by counsel are to be taken as undisputed. In this view the only question is whether the court below was justified, at this juncture, and on these facts, in directing verdicts for the United States. In the argument here the Banks invoke the equitable doctrine of estoppel, based on the rule that where one of two innocent persons must suffer for a loss caused by another, the one who made it possible for that other to cause the loss should in equity and good conscience be required to bear it. On this principle the Banks insist that the statement of facts to be shown made it clear that the Government was guilty of gross negligence in the issuance of the checks and that by reason of such negligence continuing, as it did, over a period of four or five years, during all of which time the Government failed to balance its accounts or reconcile its books, or to take proper measures to detect the frauds, it is not now, upon any equitable principle, entitled to throw the loss upon the Banks.

■ On this question the United States concede that their rights are not different from those of an individual or corporation in like circumstances. But their position on the question of negligence in the issuance of the checks and the late discovery of the forgeries is that neither is a defense which the Banks may interpose, since equitable estoppel may be invoked only if such negligence directly and proximately affected the conduct of the Banks. And this the United States say is not the case here, because the Government, as drawer, owed no duty to the Banks with reference to the endorsements, and made no representation with respect to them, and because

the Banks were under a duty to determine the genuineness of the endorsements and accepted the checks solely on their own belief in their genuineness. The correctness of this principle, in general, is established by an overwhelming majority of the cases, both State and Federal.

■ We need cite only a few[1] to establish the rule, which is incorporated in the Negotiable Instruments Law (D.C.Code 1940, Sec. 28—124), that when a signature is forged it is wholly inoperative and gives no right to enforce payment, unless the party against whom it is sought to enforce the right is precluded from setting up the forgery. While most of the decided cases deal with parties in the relation of drawer and drawee, which is not this case, that is no reason for the application of a different rule. See United States v. National Exchange Bank of Providence, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006.

The facts in the just cited case are, in their material aspects, the same as those here. There, as here, the checks were drawn by one agency of Government on another. There, as here, they were issued on fraudulent vouchers in regular form. There, as here, they were paid to the demanding bank upon the forged signatures of the payees. There, as here, the checks came into the possession of the banks without any express or implied representation by the Government of the verity of the endorsements or the title of the holder. There, as here, a large number of checks were involved. There, as here, the period during which the forgeries remained undiscovered covered some years. In such a state of facts the Supreme Court held that the bank, in paying the forged checks, acted wholly upon the apparent genuineness of the instruments and the responsibility of those presenting them, that the Government, in the circumstances, was not charged

[1] Los Angeles I. Co. v. Home S. Bank, 180 Cal. 601, 182 P. 293, 5 A.L.R. 1193; United States Cold Storage Co. v. Central Mfg. Bk., 343 Ill. 503, 175 N.E. 825, 74 A.L.R. 811; Jordan Marsh Co. v. Nat. Shawmut Bk., 201 Mass. 397, 87 N.E. 740, 22 L.R.A.,N.S., 250; Harmon v. Old Detroit Nat. Bk., 153 Mich. 73, 116 N.W. 617, 17 L.R.A.,N.S., 514, 126 Am.St.Rep. 467; Strang v. Westchester County Nat. Bk., 235 N.Y. 68, 138 N.E. 739; Seaboard Nat. Bk. v. Bank of America, 193 N.Y. 26, 85 N.E. 829, 22 L.R.A., N.S., 492; Critten v. Chemical Nat. Bk.,

171 N.Y. 219, 63 N.E. 969, 57 L.R.A. 529; Shipman v. Bank of State of N. Y., 126 N.Y. 318, 27 N.E. 371, 12 L.R.A. 791, 22 Am.St.Rep. 821; Welsh v. German-American Bk., 73 N.Y. 424, 29 Am.Rep. 175; Armstrong v. Pomeroy Nat. Bk., 46 Ohio St. 512, 22 N.E. 866, 6 L.R.A. 625, 15 Am.St.Rep. 655; Joseph Milling Co. v. First Nat. Bk., 109 Or. 1, 216 P. 560, 29 A.L.R. 358; Second Nat. Bk. v. Guaranty Trust & S. D. Co., 206 Pa. 616, 56 A. 72; Fitzgibbons Boiler Co. v. Nat. City Bk. of N. Y., 287 N.Y. 326, 39 N.E. 2d 897.

with knowledge of its payees' signatures, and that, consequently, its failure to detect the forgeries did not estop it from recovery. In other words, the failure of the Government to detect the fraud, though due to negligence, was not the cause of the loss, since in the whole transaction the Government and the bank dealt at arm's length, and the primary obligation of the bank to see to the genuineness of the endorsements continued throughout.

In Insurance Co. of N. America v. Fourth Nat. Bk. of Atlanta, D. C., 12 F.2d 100, 102, Judge Sibley, discussing the precise question here, said this:

"I do not perceive that the equitable doctrine ought to apply that, if one of two equally innocent parties must suffer by the act of a third, the loss should be borne by the party through whose fault the injury became possible. The fraud of a trusted agent does not always fix the loss on his innocent principal, as against the third person injured, though the principal was careless. It does so only when the principal has failed in his duty. In this case the duty to see that these indorsements were genuine was on the bank, and those under whom it took, and not on the insurance company. The insurance company is not complaining of the acts of its fraudulent agent. It is complaining of the dereliction of the bank, a dereliction which seems to me to be clearly established by law. If my agent steal goods from me and sell them to another, who in turn sells them, unrecognized, to me, and gets my money for them, could I not recover my money on discovery that the goods were mine, and not his who sold them to me? Could he reply that I should have recognized my goods, and not bought them, or should have kept them more safe-ly, and not let my agent steal them? Could he say that we have had many such transactions, and because they are many I should not complain? The bare fact that he had gotten my money for them on his implied representation and warranty that the goods were his and he had a right to sell them would answer the question.

"The bottom principle is the same in selling or collecting commercial paper, except for the ingrafted exception, arising from the nature of the subject-matter, that one must recognize his own or his drawer's signature and alterations in his own paper, and must promptly report such mistakes as he was not bound to recognize on presentation, but subsequently discovered. This being the law of a single transaction, nothing is presented to alter it when transactions are multiplied."[2]

In Los Angeles Ins. Co. v. Home Sav. Bk., supra, note 2, at 182 P. 297, the Supreme Court of California rejected as a proper defense the facts that the drawer had drawn and delivered checks on false vouchers of a dishonest employee, saying: "* * * it is plain that such negligence did not contribute to or induce the acceptance by the banks of the forged indorsements. The forgery of the indorsements was entirely distinct from the issuance of the checks on false demands, and there was no relation between them."

And in United States Cold Storage Co. v. Central Bank, supra, note 2, at 175 N.E. 829, the Supreme Court of Illinois stated the accepted rule in these words: "A bank can justify a payment on a depositor's account only upon the actual direction of the depositor. The questions arising upon checks between the drawee and the drawer 'always relate to what the one has author-

---

[2] Other like cases in the Federal Courts are: Fulton Nat. Bk. v. United States, 5 Cir., 107 F.2d 86; Farmers Bk. v. United States, 5 Cir., 62 F.2d 178; and United States v. National Bk. of Com., 9 Cir., 205 F. 433. Much oftener the question has been answered in State Courts and in the vast majority of cases the rule laid down is that negligence in detecting the fraud cannot be said to be the proximate cause of the payment by a bank of the forged paper, and that before the bank can justify payment it must be shown that the drawer was guilty of some act or conduct toward the drawee or holder equivalent to a representation. Typical of this class of cases are: Los Angeles I. Co. v. Home S. Bank, 180 Cal. 601, 182 P. 293, 5 A.L.R. 1193; United States

Cold Storage Co. v. Central Bank, 343 Ill. 503, 175 N.E. 825, 74 A.L.R. 811; Grand Lodge v. State Bank, 92 Kan. 876, 142 P. 974, L.R.A.1915B, 815; Hardy v. Chesapeake Bank, 51 Md. 562, 34 Am. Rep. 325; Jordan Marsh Co. v. Nat. S. Bank, 201 Mass. 397, 87 N.E. 740, 22 L.R.A.,N.S., 250; City of St. P. v. Merchants Nat. Bk., 151 Minn. 485, 187 N.W. 516, 22 A.L.R. 1221; Board of Education v. Nat. Union Bk., 121 N.J.L. 177, 1 A.2d 383; New York v. Bronx County Trust, 261 N.Y. 64, 184 N.E. 495; Shipman v. Bk. of State of N. Y., 126 N.Y. 318, 27 N.E. 371, 12 L.R.A. 791, 22 Am. St.Rep. 821; Welsh v. German-American Bk., 73 N.Y. 424, 29 Am.Rep. 175; Com. v. Globe Indemnity, 323 Pa. 261, 185 A. 796.

ized the other to do. They are not questions of negligence or of liability of parties upon commercial paper, but are those of authority solely. * * * The question of negligence cannot arise unless the depositor has, in drawing his check, left blanks unfilled, or by some affirmative act of negligence has facilitated the commission of a fraud by those into whose hands the checks may come.'"

Cases which bar the drawer from recovery on forged endorsements are those in which blank checks are signed, upon which the names of fictitious payees are afterwards filled in, Edelen v. Oakland Bk., 39 Cal.App. 302, 178 P. 737; Phillips v. Joy, 114 Me. 403, 96 A. 727, L.R.A.1916E, 690; cases in which the checks are so drawn that the names of the payees may easily be altered, Gutfreund v. Nat. Bk., 251 N.Y. 58, 167 N.E. 171, 64 A.L.R. 1103; cases in which checks are mailed to the wrong person and fraudulently endorsed, Weisberger v. Barberton Sav. Bk., 84 Ohio St. 21, 95 N.E. 379, 34 L.R.A.,N.S., 1100; United States v. First Nat. Bk., D.C., 17 F.Supp. 611; cases in which checks are delivered to an imposter who forges the payee's endorsement, Central Nat. Bk. v. Nat. Metro. Bk., 31 App.D.C. 391, 17 L.R.A.,N.S., 520; cases in which a dishonest employee verifies a supposed signature of a payee which is in fact a forgery, Thomas v. Stand. Acc. Ins. Co., D.C., 7 F.Supp. 205; and finally cases in which an agent of the drawer, empowered to sign checks, makes them payable to fictitious persons and then forges the names of such persons, Hartford Acci. & Indem. Co. v. Fifth Third Union Tr. Co., D.C., 23 F.Supp. 53; Phillips v. Mercantile Nat. Bk., 140 N.Y. 556, 35 N.E. 982, 23 L.R.A. 584, 37 Am.St.Rep. 596. (The N.I.L. now makes such checks payable to bearer. D.C.Code 1940, Sec. 28-110). These cases are typical examples of fairly well-established categories of situations in which on one ground or another the rule of absolute liability is relaxed in favor of the holder.

Two other cases may be mentioned. In Detroit Piston Ring Co. v. Wayne County Bk., 252 Mich. 163, 233 N.W. 185, 75 A.L.R. 1273, and Scott v. First Nat. Bk. in St. Louis, 343 Mo. 77, 119 S.W.2d 929, it was held that the failure of the drawers to discover the first in a series of forgeries would not operate as an estoppel in an action against the drawees, even though the means of discovering the fraud were available, but that after the drawers had notice of an unexplained shortage or leak in the funds they were required to take steps to discover the cause and their failure to do so estopped them from imposing subsequent losses on the drawees. It is clear that the principle of these cases is inapplicable here, since at no time during the period of the forgeries was any shortage discovered or suspected.

The only clear authority we are advised of for the position of the Banks is found in Erickson v. Iowa Nat. Bk., 211 Iowa 495, 230 N.W. 342; Young v. Gretna Trust & Sav. Bk., 184 La. 872, 168 So. 85; and Defiance Lumber Co. v. Bank of Cal., 180 Wash. 533, 41 P.2d 135, 99 A.L.R. 426. The rule established in these cases is that where a dishonest employee is able to carry on a planned course of forgery for a long period of time, involving numerous transactions, it is at least permissible for a jury to find that there has been negligence in the business practices and methods of the drawer, and that, if such negligence is found, it will preclude recovery against the drawee or prior endorsers. But these cases are wholly out of line with what must be recognized as the established rule in the United States, including the District of Columbia. See Nat. Met. Bk. v. Realty Appraisal & Title Co., 60 App.D.C. 86, 47 F.2d 982.

In saying this, however, we are not unmindful of the difficulty of logically distinguishing the situation here from that in many of the cases where recovery is denied, especially from that in cases where an agent empowered to sign checks commits the forgery. In either case the position of the holder is the same. It would seem that the loss no more results solely from his acceptance of the check on his faith in the endorsement in the one case than in the other. Nor is there any more undue restraint (Los Angeles Inv. Co. v. Home Sav. Bk., supra) on business in the one than in the other. The desirability of the application of the same rule to both situations has been recognized by the Legislatures of Illinois,[3] Idaho[4] and Montana.[5] These States

---

[3] Ill.Rev.Stat. (Smith-Hurd, 1935), Chap. 98, Sec. 29(3).

[4] Idaho Code Ann. (1932), Sec. 26-109 (3).

[5] Montana Rev.Code Ann. (Anderson & McFarland, 1935) Sec. 8416(3).

have changed their Negotiable Instrument Laws so as to make checks issued as these were here payable to bearer, thus bringing their law into line with the English Bills of Exchange Act. 45, 46 Vict.C. 61, sec. 7(3); Bank of England v. Vagliano Bros. [1891], A.C. 107.

In the light of present day conditions in the District of Columbia, with its thousands of Government employees, brought here from every section of the country, generally unknown outside the immediate environment of their employment, and most of whose pay checks circulate virtually on the basis of currency, there is much to be said for the passage of a similar amendment to the Negotiable Instrument Law in the District of Columbia, but if the change is to be made, it must be made by Congress and not by the Courts. Consequently, we have no alternative but to follow the rule and affirm the judgments.

Affirmed.