UNITED STATES of America,
Plaintiff,

v.

UNION TRUST COMPANY of Maryland, a body corporate, Defendant and Third Party Plaintiff,

Abraham MILLER, t/a Miller's Liquors, Samuel Portney, Harry Olschansky and Jerome Lebowitz, partners and t/a The Nodel Company, Reuben Fishkind, and American Express Co., a body corporate, Third Party Defendants.

Civ. No. 7704.

United States District Court
D. Maryland.

March 28, 1956.

820

George Cochran Doub, U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md., for the United States.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (Alexander Harvey, II), Baltimore, Md., for Union Trust Co.

Jacob Kartman and Alleck A. Resnick, Baltimore, Md., for Reuben Fishkind.

R. DORSEY WATKINS, District Judge.

This is a suit brought by the United States of America, drawer and drawee of some twenty-seven United States Treasurer's checks, to recover from the defendant, Union Trust Company of Maryland (Union Trust) on its guarantees of prior endorsements the sum of $1,782.60 with interest thereon at the rate of six per cent from the date of receipt. Union Trust, although defending on the merits, has in turn demanded judgment for all sums which may be adjudged against it in favor of the plaintiff against five of its depositors as third-party defendants on their prior unqualified endorsement of twenty-four of the said checks, one other endorser having promised to pay Union Trust if the plaintiff is successful and two prior endorsors being unidentifiable. The defense relied upon by Union Trust is the so called "imposter rule".

The facts have been stipulated. On June 10, 1941, Willie J. Hazel, a fifty-two year old World War I veteran, living at 1005 East Washington Street, Greensboro, N. C., applied to the Veterans' Administration for disability benefits and received a rating of permanent total disability from April 7, 1941, his medical report indicating he was suffering from bronchitis, generalized arteriosclerosis, hypertension, and bilateral glaucoma which had almost completely destroyed his vision. Thereafter, monthly checks were made payable to Willie J. Hazel, C 542,372, and mailed to him at Greensboro, N. C. Once a year pursuant to Veterans' Administration requirements, he was sent, and filled out and returned to the Veterans' Administration, a form to establish his eligibility to receive said checks. The forms filled out from 1942 through 1948 showed that he was married, had no children, had no source of income other than his pension, and was physically disabled. A comedy of errors begins on May 31, 1948, when Willie Hazel, Jr., of Four Holes, S. C., a twenty-four year old World War II veteran, unrelated to Willie J. Hazel, wrote to the Veterans' Administration advising them he was changing his address to 2016 Rayner Avenue, Baltimore 17, Maryland. Through error, there being no file on Willie Hazel, Jr., as he had made no application for any veteran's benefits, his letter was placed in the file of Willie J. Hazel, and, on June 30, 1948, a check in the amount of sixty dollars was made payable to Willie J. Hazel, C–542,372, 1005 East Washington Street, Greensboro, N. C., and was mailed to the Baltimore, Maryland, address of Willie Hazel, Jr. This check and the twenty-six others involved herein were received by Willie Hazel, Jr.; endorsed by him in the name of Willie J. Hazel; cashed and endorsed by one of the third-party defendants, with the exception of the two checks mentioned previously; deposited by the third-party defendants in their accounts at the Union Trust; endorsed in turn by Union Trust; and negotiated through the Baltimore Clear-

ing House. The total payment made by the Government on these checks was $1,-782.60.

On January 3, 1949, the Veterans' Administration sent its yearly form to Willie J. Hazel at 2016 Rayner Avenue, Baltimore 17, Maryland, requesting him to establish his continuing eligibility to receive disability benefits. The form, when filled out and returned, was signed "Willie Hazel, Jr." and indicated that the veteran was married, had two children, the youngest being fourteen months old was employed by H. Klaff and Company, and had earned $1,500 in excess of his pension. Although the veteran also noted that his address had been changed to 524 North Payson Street, Baltimore, Maryland, the checks continued to be mailed to Rayner Avenue until February, 1950.

In May 1949, Willie Hazel, Jr. applied to the Veterans' Administration for vocational training, giving his address as 524 North Payson Street, and in a notarized statement regarding the birth of his youngest child, gave his own name as Willie Jr. Hazel. A request noting that the application indicated the veteran might have a previous claim number was sent from the Baltimore Regional Office of the Veterans' Administration to the index division asking for any information on any previous claims. The answer to this request being "no record claim filed", Willie Hazel, Jr. was assigned C number 15,301,055 and, thereafter, received (in addition to the disability payment checks payable to Willie J. Hazel, C 542,372) monthly subsistence checks made payable to Willie Hazel, Jr., and mailed to him at 524 North Payson Street.

On January 9, 1950, Willie Hazel Jr. wrote the Veterans' Administration in regard to changing his address from Rayner Avenue to Payson Street. This letter was returned to him with a form for further identification, which form when returned to the Veterans' Administration, was signed "Willie J. Hazel," and contained certain hybrid information, written in a different handwriting,

giving the C number of Willie J. Hazel; the class of payment as school subsistence for which only Willie Hazel Jr. had applied, and the recipient as Willie J. Hazel, Jr. The word "junior" had been scratched out, presumably by a clerk in the Veterans' Administration who had then penciled in red beside it the word "same". After January 1950, the checks made payable to Willie J. Hazel were mailed to Payson Street. From 1950 through 1953 Willie Hazel, Jr. filled out the forms sent him by the Veterans' Administration to establish his continuing eligibility for disability payments, signing them in the name of Willie J. Hazel. The 1950 form showed the veteran was married; had two children, the youngest being two years and three months old; and that the claimant was employed, having earned in 1949 $3,097.65, not including his pension, and expecting to earn $2,000 in 1950 as a laborer in addition to $600 as subsistence allowance while attending school. The forms returned for the other years are similar save for the amounts involved and for the fact that the 1953 form indicated the veteran was divorced. On January 5, 1953, Sarah M. Hazel, the wife of Willie Hazel, Jr., wrote the Veterans' Administration requesting an apportionment of the disability pension of her husband, Willie J. Hazel, C–542,372, due to his failure to support her and their minor child. As a result of subsequent correspondence with the Veterans' Administration, Mr. and Mrs. Hazel went in person to the Baltimore Regional Office to state that they had effected a reconciliation. The contact officer, upon examining the claim folder, felt that the veteran was too young and too healthy looking to be eligible for the type of disability payments he had been receiving and stated "upon further examination it became quite apparent that this particular claims folder contained records pertaining to two veterans." Altogether, some fifty-five checks, totaling $3,567.60, were received and negotiated by Willie Hazel, Jr., from June 1948 through December 1952. No complaint

was forthcoming during this period from Willie J. Hazel who stated, when later questioned regarding this, that due to a previous experience with the Government when payments had been discontinued, he assumed he was no longer entitled to a pension. As for Willie Hazel, Jr., he made one refund of twenty-five dollars to the Veterans' Administration and then returned to South Carolina, where, according to a medical certificate, he was later stabbed to death by his wife.

 Union Trust invokes as a bar to recovery on all of the twenty-seven checks herein involved the impostor rule which has been recognized by a majority of both state and federal courts and which provides that a drawer, having made payable and delivered an instrument to an impostor whom the drawer believes to be the person whose name he has assumed and who is the very person intended by the drawer to present and endorse the instrument, must as against the drawee or a bona fide holder in due course bear the loss where the impostor has obtained payment or negotiated the instrument. The intent of the drawer having been effectuated, the impostor's endorsement is regarded as genuine and not as a forgery nor, accordingly, is a guarantee of prior endorsements regarded as breached, (5 Williston on Contracts, Revised Edition, sec. 1517 B; Britton on Bills and Notes, sec. 151; Montgomery Garage Co. v. Manufacturers' Liability & Ins. Co., 94 N.J.L. 152, 109 A. 296, 22 A.L.R. 1228; McCornack v. Central State Bank, 203 Iowa 833, 211 N.W. 542, 52 A.L.R. 1326; Cohen v. Lincoln Sav. Bank, 275 N.Y. 399, 10 N.E.2d 457, 112 A.L.R. 1424; 10 C.J.S. Bills and Notes, § 494(b)). To explain the rule and its application the courts have in addition to the intent theory variously relied on the theories of negligence, estoppel, and, as between two innocent parties, placing the loss on the one making the loss possible. The requirement that the instrument be both made payable to and delivered to the impostor with the intent that he be the one to negotiate it is strictly interpreted by the courts. Thus, the rule is not applied where an instrument is made payable to a named payee and through error, delivered to one having the same or a similar name, (Fulton National Bank v. United States, 5 Cir., 1952, 197 F.2d 763; Fulton National Bank of Atlanta v. United States, 5 Cir., 1939, 107 F.2d 86; Britton on Bills and Notes, sec. 152, p. 727; 10 C.J.S. Bills and Notes, § 494 (c)); where the instrument is drawn to the named payee even though he be nonexistent, fictitious or a stranger to the transaction and delivered to the impostor as the agent of the payee, (National Metropolitan Bank v. Realty Appraisal & Title Company, 1931, 60 App. D.C. 86, 47 F.2d 982; 5 Williston on Contracts, Revised Edition, sec. 1517 B, p. 4247; Britton on Bills and Notes, sec. 151, p. 718; 22 A.L.R. 1249; 52 A.L.R. 1327; 112 A.L.R. 1440); where an employee of the drawer who had some authority in respect to the drawing and/or delivery of the instrument was a party to the fraud, (United States v. National Bank of Commerce of Seattle, Washington, 9 Cir., 1913, 205 F. 433, on subsequent appeal, 9 Cir., 1915, 224 F. 679, certiorari denied 241 U.S. 658, 36 S.Ct. 287, 60 L.Ed. 1225; Montgomery Garage Co. v. Manufacturers' L. & Ins. Co., 94 N.J.L. 152, 109 A. 296, 22 A.L.R. 1228; Cohen v. Lincoln Sav. Bank, 275 N.Y. 399, 10 N.E.2d 457, 112 A.L.R. 1435); where the drawing of the instrument was induced by the impostor's impersonation but the instrument was delivered to the correct address of the person whose name the impostor had assumed, at which address the impostor intercepted the check, (District National Bank of Washington, D. C. v. Washington Loan & Trust Co., 1933, 62 App.D.C. 198, 65 F.2d 831); or where someone other than the impostor himself endorses the instrument in the impostor's assumed name.

 The first question for consideration in determining whether or not

the impostor rule applies in the instant case is whether or not such a defense can be raised against the federal government. Special factors are involved when the United States issues negotiable instruments. Such activity is conducted on a vast scale over a large area by agents of the government. From issuance to payment, transactions involving such commercial paper may take place in several different states. The Supreme Court, mindful of the need for uniformity as to the rights and liabilities of the United States on commercial paper issued by it and recognizing to perform adequately its basic function such paper must be freely transferable, has developed two basic concepts. First, the rules governing the rights and liabilities of the government on negotiable paper are to be determined by federal courts through reference to federal rather than local law (Clearfield Trust Company v. United States, 1943, 318 U.S. 363, 63 S. Ct. 573, 87 L.Ed. 838; National Metropolitan Bank v. United States, 1945, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383). Second, the United States is not a preferred suitor, its rights and liabilities being identical with those of a private individual under the same circumstances (United States v. National Exchange Bank of Baltimore, 1926, 270 U.S. 527, 46 S.Ct. 388, 70 L.Ed. 717; Clearfield Trust Company v. United States, supra).

In applying these concepts to altered instruments and forged endorsements, the Supreme Court has held that the government cannot recover an overpayment paid by it on a check, the face amount of which had been fraudulently raised, because, being both drawer and drawee, the government is bound to a knowledge of its own checks (United States v. National Exchange Bank of Baltimore, supra, affirming 1924, 4 Cir., 1 F.2d 888). The general rule that recovery may be had from one who, having guaranteed prior endorsements, presents and collects a valid commercial instrument with a forged endorsement was recognized in the Clearfield case,

supra. The existence of certain well established exceptions to this general rule was noted in National Metropolitan Bank v. United States, supra, 323 U.S. at pages 458, 459, 65 S.Ct. 354, and one of these exceptions held to govern in United States v. Chase National Bank, 1920, 252 U.S. 485, 40 S.Ct. 361, 64 L. Ed. 675, where the government as drawee was denied recovery upon a forged endorsement since the government's name as drawer had also been forged.

Two other cases dealing with forged endorsements in which the government has been allowed to recover, require a closer analysis. In United States v. National Exchange Bank of Providence, 1909, 214 U.S. 302, 29 S.Ct. 665, 53 L. Ed. 1006, the government, upon receipt of certain forged pension vouchers, drew 194 pension checks payable to the pensioners named in the vouchers and mailed the checks to the addresses given in the vouchers. Subsequently, the payees' endorsements were forged, and the checks negotiated. The impostor rule was not raised as a defense nor does it affirmatively appear that such a defense would have been available. The case was decided upon an agreed statement of facts, one of which was that the payees' endorsements were forged (United States v. National Exchange Bank of Providence, supra, 214 U.S. at page 310, 29 S.Ct. 665). The Supreme Court did not, nor can this court, go behind the agreed statement to conjecture as to which of the innumerable variations of fact, if any, made the defense of the impostor rule unavailable. The decision in the National Exchange Bank of Providence case is referred to as involving forged endorsements (United States v. National Exchange Bank of Baltimore, supra, 270 U.S. at page 534, 46 S.Ct. 388; Clearfield Trust Company v. United States, supra, 318 U.S. at page 368, 63 S.Ct. 573), and is limited to a holding that prompt notice of the discovery of a forged endorsement is not a condition precedent to suit, the question of wheth-

er or not lack of prompt notice might be a defense not having been reached (Clearfield Trust Company v. United States, supra, 318 U.S. at page 369, 63 S.Ct. 573).

In National Metropolitan Bank v. United States,[1] supra, upon receipt of certain pay and travel mileage vouchers forged by a civilian clerk in the Paymaster's Office of the Marine Corps, the government drew 144 checks payable to the officers named in the vouchers and delivered the checks to the civilian clerk for distribution to the named payees. The clerk then endorsed these checks in the payees' names. The impostor rule is clearly not applicable. The checks were not delivered by the government to its own clerk believing him to be the person whose name he had assumed and intending him to be the person to present and endorse the instruments. Moreover, rules of law relative to the relationship of principal and agent are called into play where the drawer's employee having some authority in respect to the drawing and/or delivery of the instrument is a party to the fraud.

That the Supreme Court appreciated that this distinction had been made by courts is evidenced by two facts. First, it notes in affirming the decision of the District of Columbia Court of Appeals, in 142 F.2d 474, that the authority relied on by that court was the decision in Washington Loan & Trust Company

v. United States, 1943, 77 U.S.App.D.C. 284, 134 F.2d 59.[2] The Court of Appeals for the District of Columbia referred in both cases to a number of exceptions, none of which applied to the facts then before the court, which would bar a drawer or drawee from recovering on a guarantee of prior endorsements and in the Washington Loan & Trust Company case, supra, 134 F.2d at page 63, lists the impostor rule as such an exception.

Secondly, the Supreme Court, in the National Metropolitan Bank case, supra, 323 U.S. at page 459, 65 S.Ct. at page 356, states:

"We do not say that there may not be some circumstances, not now before us, under which the government might be precluded from recovery because of conduct of a drawer prior to a guaranty of endorsement. We do hold that negligence of a drawer-drawee in failing to discover fraud prior to a guaranty of the genuineness of prior endorsements does not absolve the guarantor from liability in cases *where the prior endorsements have been forged.*" (Emphasis supplied.)

The conclusion that this court draws from the Supreme Court cases just cited is that the impostor rule should be applied to commercial paper issued by the federal government in those circumstances where it would be

---

1. Certiorari was granted by the Supreme Court in the National Metropolitan Bank case because of a conflict between the decision of the Court of Appeals for the District of Columbia in National Metropolitan Bank v. United States, 1944, 79 U.S.App.D.C. 54, 142 F.2d 474, and the decision in United States v. First National Bank of Chicago, 7 Cir., 1943, 138 F.2d 681. This conflict arose as to the effect of the drawer-drawee's negligence, prior to a specific guaranty of endorsements, on the right to recover upon a forged endorsement. The impostor rule was not raised as a defense in the First National Bank case nor does the court's statement of facts indicate an impersonation induced the issuance of the checks involved therein.

2. In the Washington Loan & Trust Company case, 134 F.2d at page 62, the court cites with approval, as applying to the facts before it, the statement of Judge Sibley in Insurance Company of North America v. Fourth National Bank of Atlanta, D.C.N.D.Ga.N.D.1926, 12 F.2d 100, 102; Id., D.C.N.D.Ga.1926, 14 F.2d 131; Id., 5 Cir., 1928, 28 F.2d 933, certiorari denied 279 U.S. 853, 49 S.Ct. 349, 73 L.Ed. 996.

"* * * The fraud of a trusted agent does not always fix the loss on his innocent principal, as against the third party injured, though the principal was careless. * * *"

Judge Sibley in this same decision mentioned and distinguished the impostor rule.

applied had the paper been issued by a private individual.

A majority of the federal courts have reached this same conclusion both before and after the decisions in United States v. National Exchange Bank of Providence, supra, and National Metropolitan Bank v. United States, supra (Security-First National Bank of Los Angeles v. United States, 9 Cir., 1939, 103 F.2d 188; United States v. First National Bank of Prague, Oklahoma, 10 Cir., 1941, 124 F.2d 484; United States v. First National Bank, Albuquerque, N. M., 10 Cir., 1942, 131 F.2d 985, certiorari denied 318 U.S. 774, 63 S.Ct. 830, 87 L.Ed. 1144; Continental-American Bank & Trust Company v. United States, 5 Cir., 1947, 161 F.2d 935, on subsequent appeal, 5 Cir., 1949, 175 F.2d 271, certiorari denied 338 U.S. 870, 70 S.Ct. 146, 94 L.Ed. 534; United States v. National Exchange Bank, C.C.E.D.Wis. 1891, 45 F. 163; United States v. Liberty Insurance Bank, D.C.W.D.Ky.1928, 26 F.2d 493; United States v. First National Bank & Trust Co. of Oklahoma City, Oklahoma, D.C.W.D.Okl.1936, 17 F.Supp. 611; United States v. Bank of America National Trust & Savings Association, D.C.N.D.Cal.S.C.1942, 47 F. Supp. 279 (dictum), new trial granted in D.C.1943, 51 F.Supp. 751, as to issue of damages incurred through lack of prompt notice of forged endorsements; United States v. First National Bank & Trust Company, D.C.W.D.N.C.1950, 92 F.Supp. 356).[3] No distinction has been made by the courts between the effect to be given an impersonation by mail and one in person, due probably to the desirability of promoting the transferability of commercial paper issued by the federal government (Britton on Bills and Notes, sec. 151, p. 724; 5 Williston on Contracts, Revised Edition, sec. 1517 B).

■ Returning to the facts of this case, subsequent to May 31, 1948 when Willie J. Hazel's address was changed through error and prior to January 10, 1949, when the Veterans' Administration received the first form filled out by the impostor to establish his eligibility for veteran's benefits, the government, acting on information received from and concerning Willie J. Hazel clearly intended Willie J. Hazel as the payee. Consequently, the endorsements by Willie Hazel, Jr. of these checks are forgeries (Fulton National Bank v. United States, supra; Fulton National Bank of Atlanta v. United States, supra). The checks issued after January 10, 1949 were intended to be paid to and endorsed by the person who had satisfied the Veterans' Administration that he was entitled to such disability payments, in this case Willie Hazel, Jr. Part III, paragraph II of Veterans' Regulation No. 1(A) promulgated by Ex.Ord. No. 6156, 6–6–1933, 38 U.S.C.A. Ch. 12A, provides that whenever the annual income of a pensioner exceeds the amount therein specified[4] the award of pension shall be discontinued and that the Veterans' Administration may require such information, proofs, or evidence of income as may be necessary. It was a possible violation of this regulation which finally led the Veterans' Administration to discover that the impostor was not entitled to the checks he had been receiving. Actually, the Veterans' Administration must have failed to check against each other any of the forms sent in by the impostor. Had the 1949 form, which was placed directly on top of the 1948 form, been compared with the 1948 form, some question would

---

3. For decisions not applying the impostor rule after having considered such issues as intent, negligence, and estoppel see: United States v. National City Bank of New York, D.C.S.D.N.Y.1939, 28 F.Supp. 144; United States v. Canal Bank & Trust Co., D.C.E.D.La.1939, 29 F.Supp. 605.

4. This amount was $1,000 for a single person or $2,500 for a married person or any person with minor children until amended, effective July 1, 1952, to $1,400 and $2,700 respectively.

certainly have arisen as to how in twelve months Willie J. Hazel, a physically disabled veteran who had had no source of income other than his pension for over seven years and who had no children, had suddenly become Willie Hazel, Jr., the father of two children, the youngest being fourteen months old, and had earned $1,500 in excess of his pension. Likewise, question should have arisen in regard to the 1950 form which, on its face, showed that the impostor had not been eligible for benefits in 1949, his income for that year having been $3,-097.65, not including disability pension, and that he would not be eligible for the coming year, his estimated income for 1950 being $2,000, plus $600 subsistence allowance [5]. As a matter of law, the Veterans' Administration was required to act on the information furnished by the completed forms. That it did not so act as a matter of fact cannot change the legal consequences of the drawing and delivery of checks subsequent to the receipt of such information. For the same reason the intent of the drawer is not affected by the fact that the impostor signed the first yearly form in the name of Willie Hazel, Jr. As far as the plaintiff is concerned, Willie Hazel, Jr. assumed the identity of Willie J. Hazel when he accepted and returned a form with the C number and the name of Willie J. Hazel printed thereon by the Veterans' Administration. None of the endorsements on checks issued subsequent to January 10, 1949 are forgeries.

The court will sign an appropriate order in favor of the plaintiff as against the defendant Union Trust as to the checks issued on June 30, 1948; July 31, 1948; and November 30, 1948 totalling $180, together with interest thereon at the rate of 6% per annum from the date of receipt; and in favor of the defendant Union Trust as against third-party defendant Reuben Fishkind as to the checks issued on June 30, 1948 and July 31, 1948 totalling $120, together with interest thereon at the rate of 6% per annum from the date of receipt; and in favor of the defendant Union Trust as to the remaining twenty-four checks; the defendant Union Trust to pay only its own costs.

5. 38 C.F.R. sec. 3.228 (c) (3) relating to computation of annual income provides subsistence allowances under Public Law 346 shall be included as income.